SMART INVENTIONS, INC., Plaintiff,

v.

ALLIED COMMUNICATIONS CORP., a Florida corporation; International Brands Marketing, Inc., a Florida corporation; International Brand Management LLC, a Delaware limited liability company, Defendants.

No. CV 00–00780 ABC.

United States District Court, C.D. California.

March 20, 2000.

1062

Loeb & Loeb, Stephen R. Mick, Philip Graves, Los Angeles, CA, for plaintiffs.

Stone & Stone, Steven H. Stone, Encino, CA, for defendant.

## ORDER RE: SMART INVENTION'S APPLICATION FOR PRELIMINARY INJUNCTION

COLLINS, District Judge.

Plaintiff Smart Invention Inc.'s application for a preliminary injunction came on regularly for hearing before this Court on March 20, 2000. After reviewing the materials submitted by the parties, argument of counsel, and the case file, it is hereby ORDERED that the application is GRANTED with MODIFICATIONS.

### I. Background

This case involves two competing direct marketing sellers of the same product—a disk-shaped battery-operated light that illuminates when its dome is pressed. Plaintiff markets its light under the name "Tap Light," and Defendants [1] market their light under the name "Click Light" (collectively, the "Light"). In August 1999, Plaintiff finished shooting its television commercial for the Tap Light. In mid-August 1999, Plaintiff tested the commercial with limited air time purchases. Satisfied with the viewer responses, in late August 1999, Plaintiff rolled out the commercial nationwide. Since September 1999, Plaintiff has spent more than $5 million in advertising and promotion of the Tap Light. Plaintiff sells six Tap Lights for $19.95.

In October 1999, Defendants produced a series of commercials featuring the Click Light. Prior to producing these commercials, Marc Kravets, the president of Defendant International Brands Marketing, Inc., saw a Tap Light commercial. Defendants offer six Click Lights for "free"— customers only pay the $6.95 shipping and handling—as part of a marketing campaign to promote America's Advantage, a membership discount buying program. Defendants launched their nationwide advertising campaign in mid-January 2000. Defendants spend about $750,000 per week on advertising and promotion of their Click Lights.

Plaintiff claims a copyright on its two-minute commercial. On January 25, 2000, it filed this action against Defendants, alleging that the two-minute Click Light commercial infringes on Plaintiff's copyright, violates state and federal unfair competition law and violates state and federal false or deceptive advertising laws. On February 24, 2000, the Court denied Plaintiff's *ex parte* application for a temporary restraining order. However, the Court granted Plaintiff's request for an order to show cause why a preliminary injunction should not be issued. On March 3, 2000, Defendants filed their opposition to Plaintiff's request for a preliminary injunction. On March 10, 2000, Plaintiff filed a reply.

### II. Discussion

#### A. Standard for Preliminary Injunction

In the Ninth Circuit, preliminary injunctive relief is appropriate when the moving party demonstrates either "(1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted; or (2) the existence of

---

1. Two defendants have responded to this matter. Defendant International Brands Marketing, Inc. is the direct marketing company that sells the competing product at issue. But Defendant Allied Communications Corp. claims it has no connection to this matter. Opp., Ex. 1 [Kravets Decl. ¶ 2]. For purposes of this preliminary injunction motion only, the Court shall refer to both "Defendants" as the competing sellers in this case.

serious questions going to the merits and that the balance of hardships tips sharply in its favor." *Int'l Jensen v. Metrosound U.S.A.,* 4 F.3d 819, 822 (9th Cir.1993). These two alternatives " 'are not separate tests but the outer reaches of a single continuum.' " *Id.* "Essentially, the trial court must balance the equities in the exercise of its discretion." *Id.*

## B. Copyright Infringement Claim

▪ To establish copyright infringement, the plaintiff must prove (1) ownership of a valid copyright and (2) that the defendant copied the plaintiff's copyrighted work. *Data East USA, Inc. v. Epyx, Inc.,* 862 F.2d 204, 207 (9th Cir.1988). In most infringement cases, evidence of direct copying is difficult to obtain. Therefore, copying may be established by circumstantial evidence of (1) the defendant's access to the copyrighted work before the creation of its work and (2) substantial similarity of both the ideas and expression between the copyrighted work and the defendant's work. *Id.; Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1442 (9th Cir.1994). Once a plaintiff demonstrates probable success on the merits of a copyright infringement claim, it is entitled to a presumption of irreparable injury. *Sun Microsystems, Inc. v. Microsoft Corp.,* 188 F.3d 1115, 1119 (9th Cir.1999).

Here, for purposes of the preliminary injunction motion, Defendants do not challenge the validity of Plaintiff's copyright. Opp. at 7.[2] Defendants also do not dispute that they had access to Plaintiff's commercial prior to producing the Click Light commercial. Opp. at 7; Kravets Decl. ¶ 4 (admission re access). Thus, the determi-

native factor in this case is whether there is "substantial similarity" between the Tap Light commercial and the Click Light commercial.

### 1. Substantial Similarity

▪ The Ninth Circuit applies a two-part test to determine substantial similarity. First, the "extrinsic" test "objectively considers whether there are substantial similarities in both ideas and expression." *Apple Computer,* 35 F.3d at 1442 (discussing the expansion of the test first set forth in *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1164 (9th cir.1977) (hereinafter *"Krofft"*)). Thus, the extrinsic test "encompass[es] all objective manifestations of creativity." *Shaw v. Lindheim,* 919 F.2d 1353, 1353 (9th Cir.1990). In dramatic works, the objective elements include the theme, plot, dialogue, mood, pace, setting, characters and sequence of events. *Id.* at 1359. Second, the "intrinsic" test evaluates the similarity of expression from the standpoint of an ordinary reasonable observer. *Apple Computer,* 35 F.3d at 1442. The intrinsic test measures expression subjectively, looking for substantial similarity in the " 'total concept and feel of the works.' " *Data East,* · 862 F.2d at 208.

▪ The trial court must use "analytic dissection[3] to determine the scope of copyright protection before works are considered 'as a whole' " "[b]ecause only those elements of a work that are protectable and used without the author's permission can be compared when it comes to the ultimate question of illicit copying[.]" *Apple Computer,* 35 F.3d at 1443. Analytic

2. There is no question that a television commercial qualify for protection under the Copyright Act. *See* 17 U.S.C. § 101 (" 'Audiovisual works' are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied"); *Chuck Blore & Don Richman, Inc. v. 20/20 Advertis-*

*ing, Inc.,* 674 F.Supp. 671, 677 (D.Minn.1987) (commercials constitute audiovisual works as defined by 17 U.S.C. § 101); *see also American Direct Marketing, Inc. v. Azad Int'l, Inc.,* 783 F.Supp. 84, 94 (E.D.N.Y.1992).

3. " 'Analytic dissection' focuses on isolated elements of each work to the exclusion of the other elements, combination of elements, and expressions therein." *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1398 n. 3 (9th Cir.1997).

dissection requires the court to separate unprotectable facts and ideas from potentially protectable expressions. *Id.* Then, the court must "apply the relevant limiting doctrines in the context of the particular medium involved, through the eyes of the ordinary consumer of that product." *Id.* Relevant limiting doctrines include the merger and "scenes a faire" doctrines. *See, e.g., id.* at 1444. After "dissect[ing] the alleged similarities and consider[ing] the range of possible expression, the court must define the scope of the plaintiff's copyright—that is, decide whether the work is entitled to 'broad' or 'thin' protection." *Id.* at 1443.

## 2. Unprotectable Elements and Limiting Doctrines

### a. Ideas v. Expression

■ It is an axiom of copyright law that ideas are not protected. *Data East,* 862 F.2d at 207; *see* 17 U.S.C. § 102 ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery ..."). Copyright protects only an author's expression of an idea. *Data East,* 862 F.2d at 207. The scope of protection, or "the degree of substantial similarity required to show infringement[,]" will vary "according to the type of work and the ideas expressed in it." *Landsberg v. Scrabble Crossword Game Players, Inc.,*

4. Facts, like ideas, are not copyrightable. *Feist Publications, Inc. v. Rural Tel. Service Co., Inc.,* 499 U.S. 340, 347, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). But original compilations and arrangements of facts may be copyrightable. *Id.* at 348, 111 S.Ct. 1282. The Court rejects Plaintiff's assertion that unprotectable facts are not involved in this case. *See* Reply at 4. As explained below, certain of the allegedly similar scenes contain unprotectable factual elements.

5. Another related principle is that "functional" elements of a work are not copyrightable. *Sega Enterprises Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1524 (9th Cir.1992). Functional elements are those that are dictated by the function performed, or necessary to depict a certain form of expression, *e.g.,* certain logi-

736 F.2d 485, 488 (9th Cir.1984). "Some ideas can be expressed in myriad ways, while others allow only a narrow range of expression." *Id.*

■ For example, fictional works involving the basic idea of a "boy meets girl" generally fall within the first category. *Id.* This idea can and has been expressed in countless ways, "with infinite variations in setting, sequence of incident and characterization." *Id.* In contrast, authors wishing to convey facts [4] often can only choose from a narrow range of expression. *Landsberg,* 736 F.2d at 488. "Since a subsequent author wishing to express the same facts will probably be required to use similar language, the scope of protection afforded factual works is very thin." *Pasfield v. ITT Hartford Group, Inc.,* 44 U.S.P.Q.2d 1776, 1780, 1997 WL 745038 (S.D.Cal. Oct.7, 1997) (quoting *Landsberg,* 736 F.2d at 488); *cf. (Feist Publications v, Rural Telephone Service Co.,* 499 U.S. 340, 357–58, 111 S.Ct. 1282, 113 L.Ed.2d 358) (the principle that copyright does not protect facts "inevitably means that the copyright in a[n] [original] factual compilation is thin").[5]

### b. Merger

■ In addition, the Ninth Circuit recognizes the so-called "merger" doctrine, which applies when an idea and its expression coincide. *Apple Computer,* 35 F.3d at 1444; *Krofft,* 562 F.2d at 1168 ("The idea

cal and structural elements of computer programs (*id.*) or the steps or executional elements of a scientific experiment (*Procter & Gamble Co. v. Colgate–Palmolive Co.,* 1998 WL 788802, *49 (S.D.N.Y. Nov.9, 1998)). Works containing strong functional elements receive "thin" protection. *Sega Enterprises,* 977 F.2d at 1524. Defendants, misconstruing the concept of a "functional" element, contend that practically every scene at issue constitute a "functional feature[ ] of the commercial .... required to provide information regarding the product." *See* Opp. at 10 & Ex. 10. Defendants' contention has no merit. None of the 11 alleged similarities at issue involve "functional" elements. Therefore, the Court will not specifically address each of Defendants' "functional" arguments.

and the expression will coincide [or merge] when the expression provides nothing new or additional over the idea"). For example, the idea of a jeweled bee pin and its expression—a jewel-encrusted bee pin— are essentially indistinguishable. *Krofft*, 562 F.2d at 1168 (discussing *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738 (9th Cir.1971)). In such a case, "[a] high degree of similarity" between the idea and its expression is " 'inevitable.' " *Shaw*, 919 F.2d at 1360. Similarly, because "the idea of an icon in a [computer] desktop metaphor representing a document stored in a computer program can only be expressed in so many ways[,]" the expression by way of an "iconic image shaped like a page" is considered merged with the idea. *Apple Computer*, 35 F.3d at 1444. "[N]o substantial similarity of expression will be found when the idea and its expression are ... inseparable, given that protecting the expression in such circumstances would confer a monopoly of the idea upon the copyright owner." *Shaw*, 919 F.2d at 1360 (citing *Data East*, 862 F.2d at 208) (quotations omitted). When the merger doctrine applies, "the expression will only be protected against nearly identical copying." *Apple Computer*, 35 F.3d at 1444.

#### c. Scenes a Faire

 The doctrine of "scenes a faire"—or " 'scenes which must be done' " [6]—is closely related to the merger doctrine. *See Apple Computer*, 35 F.3d at 1444. Scenes a faire are "expressions that are 'as a practical matter, indispensable or at least standard in the treatment of a given [idea].' " *Data East*, 862 F.2d at 208; *accord* 4 Nimmer on Copyright § 13.03[B][4] ("similarity of incidents or plot that necessarily follows from a com-

mon theme or setting").[7] In the genre of television commercials for direct telephone/mail sales, scenes a faire include "references to more expensive competing products, shots of print advertisements of such products, free offers of complementary goods, close ups of the offered item in use, and close ups of 'undesireable' competing goods during similar use." *American Direct Marketing, Inc. v. Azad Int'l, Inc.*, 783 F.Supp. 84, 95 (E.D.N.Y.1992).

#### 3. Alleged Similarities.

Plaintiff contends that the two commercials contain several substantially similar scenes/elements. Specifically, Plaintiff alleges that the following eleven scenes/elements are substantially similar:

1. Tap Light: Woman fumbling in dark bedroom for light switch with narration: "Have you ever fumbled around in the dark looking for a light switch?" Click Light: Woman fumbling in dark bedroom for light switch with narration: "Now you'll never get left in the dark again." [8]

2. Tap Light: Woman getting up from bed and using Tap Light with narration: "It's perfect when nature calls in the middle of the night." Click Light: Woman getting up from bed and using Click Light with narration: "In the bedroom, they're great for those late night trips to the washroom."

3. Tap Light: Scrolling list of uses and locations for the Tap Light. Click Light: Scrolling list of uses and locations for the Click Light.

4. Tap Light mounted in a closet. Click Light mounted in a closet.

5. Tap Lights mounted along a dark indoor staircase, with a child climb-

---

**6.** 4 Nimmer on Copyright § 1303[B][4].

**7.** For example, the visual display of a karate match (in a video game) conducted by two combatants, each wearing different color shorts and using common karate moves, supervised by a referee, and scored by a certain system are inherent or indispensable in the sport of karate. *Id.* at 209. Thus, they are

not protectable. *Id.* (under either the merger or scenes a faire doctrine); *see Apple Computer*, 35 F.3d at 1444 (using *Data East*'s karate game to illustrate the scenes a faire doctrine).

**8.** Where, as here, Plaintiff misquotes the narration from Defendant's commercial, the correct quotation is substituted.

ing down the stairs, with narration: "Use it to illuminate a dark stairwell." Click Lights mounted along a dark indoor staircase with a child climbing up the stairs.

6. Tap Lights mounted along an outdoor walkway with narration: "And Use it to ... provide light for an outdoor party or walkway." Click Lights mounted along an outdoor walkway.

7. Child's hand reaching up and clicking a wall-mounted Tap Light with narration: "They adjust so they're always in reach." Child's hand reaching up and clicking on a wall-mounted Click Light.

8. Tap Light used to replace a broken interior light in a vehicle. Click Light used to replace a broken interior light in a vehicle.

9. Tap Light used during storm with narration: "[It] is safer than candles for a storm that knocks out the power supply." Click Light used during a storm with narration: "Forget about those dangerous candles when the power goes out. Just click your way to safety."

10. Tap Light: Catalogue advertisement for a similar light with a price of $9.99 each with narration: "Similar lights cost up to $10 each." Click Light: Catalogue advertisement for a similar light with a price of $9.99 each with narration: "You've seen similar products selling for as much as $10 each."

11. Scene showing order for six Tap Lights is a $60 value. Describing set of six Click Lights as "a full $60 value."

(*See* Motion at 4–5.) Plaintiff argues that a comparison of these scenes shows that Defendants copied Plaintiff's commercial. In response, Defendants argue that each of these scenes contain non-protectable elements. Defendants contend that the two commercials are not substantially similar after the non-protectable elements are excluded.

### 4. Analysis[9]

Here, there is no question that both commercials share similar ideas, giv-

---

9. Preliminarily, the Court notes that there appear to be few published cases concerning copyright infringement of a commercial by another commercial, and none involving two commercials that permissibly market the same product in the Ninth Circuit. Plaintiff cites *Chuck Blore & Don Richman, Inc. v. 20/20 Advertising, Inc.,* 674 F.Supp. 671 (D.Minn.1987), and Defendants cite *American Direct Marketing, Inc. v. Azad Int'l, Inc.,* 783 F.Supp. 84 (E.D.N.Y.1992), two published commercial vs. commercial cases, in support of their positions. The Court finds that neither is directly on point.

*Chuck Blore* involves two commercials featuring the same actress advertising completely different products—newspaper and radio station vs. eyewear products. 674 F.Supp. at 674. With such different subject matters, the district court found that the "total concept and feel" of the defendant's commercial, which featured the same artistic choices as the plaintiff's (*e.g.,* the same actress wearing a white shirt with blue stripes with close-ups of the actress in different poses and different hairstyles), was substantially similar to plaintiff's commercial so as to preclude granting the defendant's motion for summary judg-

ment. *Id.* at 679–80. The extrinsic test applied by the *Chuck Blore* court is similar to the old *Krofft* test in the Ninth Circuit, which, as discussed above, has since evolved to a slightly different test. *See id.* at 679. Also, the district court applied a very superficial extrinsic test analysis before proceeding to evaluate the "total concept and feel" of the commercials, finding in one sentence that there is substantial similarity of ideas in the two commercials: "the use of the television medium to present a thirty-second commercial using Deborah Shelton to promote a product." *Id.* More importantly, unlike this case, the commercials in *Chuck Blore* involved the marketing of completely different products outside the more constrained direct marketing framework.

The commercials in *American Direct Marketing,* on the other hand, were both created for direct mail marketing. Also, the case involves competitors of a similar product—a tooth whitening system and a rotating toothbrush. 783 F.Supp. at 86. However, the district court applied a similarity analysis that seems quite different than the Ninth Circuit's extrinsic/intrinsic analysis. *See* 783 F.Supp. at 94–95. Moreover, the court fails to thor-

en that both feature and sell the exact same utilitarian product. Necessarily, the two commercials also attempt to convey the same facts. That the Light is battery-operated, water resistant, and turns on or off with a tap on the dome are facts that cannot be protected by copyright.[10] Also, the fact that the Light can either be placed on a flat surface or mounted on a wall (or other upright surface) is not protectable. Similarly, Plaintiff cannot copyright the fact that competitors advertise the same light for up to $9.99 (or $10.00) and, therefore, six lights may have a $60 value. Therefore, the Court does not consider alleged similarity nos. 10 and 11. *See* Motion at 4.

■ In addition, the idea that the light can be mounted in a closet and the expression—a scene that simply shows a light mounted in a closet—are merged. To hold otherwise, as Plaintiff suggests, would give Plaintiff a monopoly on depicting the use of the light in a closet. Because Defendants' depiction of this idea is not identical to Plaintiffs,[11] the Court does not consider alleged similarity no. 4. *See* Motion at 4.

■ As to alleged similarity no. 8, the Court finds that the idea at issue is the use of the Light in a vehicle, and not simply the use of the Light anywhere outside the house. When an interior light or trunk light goes out, a person would generally use a flashlight to illuminate the area if she needed some light. Plaintiff cannot have a protectable interest in the idea of

using a battery-operated Light in such a setting. With respect to its expression, only two areas of a vehicle may ordinarily need night—the interior of the vehicle or the trunk of the vehicle. Thus, the idea of using the Light to replace broken lights in a vehicle, like the idea of an icon in a computer desktop display that represents a document stored in a program in *Apple Computer*, can only be treated in so many ways. Therefore, the expression will only be protected against nearly identical copying. 35 F.3d at 1444. Here, because the two expressions are not identical, the Court declines to consider alleged similarity no. 8.

Moreover, as noted above, the reference to and close-up shot of a print advertisement of a more expensive light sold elsewhere constitutes scenes a faire in the direct mail/telephone marketing context. This, in addition to the unprotectable fact that competitors sell the light for up to $9.99 elsewhere, causes the Court to disregard alleged similarity no. 10. *See id.*

■ Even without considering the above segments, however, substantial similarity exists on an objective level. The Court discusses the remaining allegedly similar scenes below.

**Alleged Similarity No. 1: *Woman fumbling in dark bedroom for light switch***

In Plaintiff's commercial, this scene involves a young woman in bed who knocks over a glass on her nightstand while reach-

---

oughly explain why it concluded that the commercials were not "strikingly similar, although similarities exist" and "the building blocks of the commercials, the individual pictorial images, and word content are not substantially similar." *Id.* at 95.

Therefore, to the extent that either side urges the Court to follow the rulings in these cases, the Court declines to do so. However, although neither *Chuck Blore* nor *American Direct Marketing* is directly on point, the Court did find some of their discussions helpful.

10. The Court notes that Plaintiff did not include in its list of substantially similar scenes the following segments of Defendants' com-

mercial (which is also contained in Plaintiff's commercial): closeup showing a hand tapping on the dome of the light; closeup showing water/rain sprayed on the light in an outdoor setting; and closeup showing the light's open battery compartment. *See* Motion at 4.

11. In Plaintiff's commercial, the narrator stands in an open closet and taps on the light mounted on the interior wall. In Defendant's commercial, one scene shows a woman turning on the light mounted on inside of a kitchen cabinet door to take out a glass and another scene shows the light mounted on inside of pantry door with words "PERFECT FOR CLOSETS" on screen.

ing for the light switch on the table lamp. The woman is sleeping on the left side of the bed (from the viewer's perspective) and a man is sleeping on the right. When the lamp light turns on, the man wakes up. In Defendants' commercial, this scene involves an older woman (with gray hair) in bed who knocks over a prescription bottle on her nightstand while reaching for the light switch on the table lamp. She is alone in bed. The scenes are accompanied by the narrator saying: "Have you ever fumbled around in the dark looking for a light switch?" or "Now you'll never get left in the dark again!" In both commercials, this is the first scene [12] that demonstrates a possible use for the Light, the segment is followed by a close up of the product and then followed by another scene where the Light is used with ease by a woman in a bedroom.

Defendants contend that the idea at issue is the use of the Light as a "[n]ight-time visual aid in residence" and this expression (woman fumbling in dark) merges with the expression. Opp., Ex. 10. This contention has no merit. Assuming that the idea is the use of the Light as a nighttime visual aid, this idea certainly can be expressed in a myriad of ways. This idea is not indistinguishable from the expression. Nor are there only a limited number of ways to express this idea. Indeed, the fact that Defendants identified at least three separate scenes from Plaintiff's commercial that purport to convey this idea belies Defendants' contention. *See id.*

Rather than the broader idea suggested by Defendants, the Court finds that the idea at issue is the use of the Light as a nighttime visual aid in the bedroom. Although Defendants' version contains some dissimilar details (*e.g.,* the older woman, no man in bed, the prescription bottle, the style of bedframe, the side of the bed on which the woman slept, and the pajamas

worn), this scene is substantially similar to the expressive idea in Plaintiff's commercial in that they both contain a similar manner of expression, namely: (1) a woman getting up from bed in a dark room; (2) the woman reaching for her bed-side lamp; (3) the woman knocking something over in the process; and (4) similar placement of this scene (as the first segment in the commercial).

**Alleged Similarity No. 2:** *Woman getting up from bed and using Tap Light*

In Plaintiff's commercial, this scene depicts a couple (in their 20's to 30's) sleeping in bed. The woman with long blond hair sleeps on the left side of the bed (from the viewer's perspective). The woman reaches over to turn on the Tap Light sitting on her nightstand and gets up (presumably to use the bathroom). The man remains sleeping, undisturbed by the "ambient" light. The segment immediately flashes to the bathroom where the woman is standing in front of the mirror/sink. She turns on a Tap Light placed on the counter to the left of the sink, turns on water and washes her hands. In Defendants' commercial, this scene also depicts a couple (in the 20's to 30's) sleeping in bed. The woman with short brunette hair sleeps on the right side of the bed (from the viewer's perspective). She reaches over to turn on Click Light sitting on her nightstand and gets up (presumably to use the bathroom). The man remains sleeping. The commercial immediately flashes to the bathroom where the woman is standing in front of the mirror/sink. She turns on a Click Light mounted low on the wall next to the sink, turns on water and washes her hands. In both commercials, these scenes are accompanied by the following narration: "It's perfect when nature calls in the middle of the night" or "In the bedroom,

---

**12.** Technically, the first segment of Plaintiff's commercial is the introduction of Anthony Sullivan, the narrator of the light. He states: "Hi! My name is Anthony Sullivan and here's another great invention for around the house. It's called the Tap Light." However, the first segment that actually illustrates a possible scenario where the Tap Light may come in handy is the woman fumbling in the dark scene. Thus, the Court treats the woman fumbling in the dark scene as the "first" scene of Plaintiff's commercial.

they're great for those late night trips to the washroom."

Again, the Court finds that the idea at issue is the use of the Light as a nighttime visual aid inside the bedroom (or a combination of bedroom and bathroom). Although Defendants' version contains different details (*e.g.*, brunette woman with short haircut, the pajamas worn, the side of the bed on which the woman slept, the wall-mounted Light, and the placement of this segment as the ninth scene instead of the forth), this scene is substantially similar to the expressive idea in Plaintiff's commercial in that both contain a similar manner of expression, namely: (1) a woman getting up from bed in a dark room; (2) the woman turning on the Light placed on her nightstand; (3) the man remains sleeping in bed; and (4) the woman standing in front of the bathroom sink, turning on the water and washing her hands.

**Alleged Similarity NO. 3:** *Scrolling list of uses and locations for the Tap Light*

Both commercials contain a scrolling list of uses and locations for the Light. The words include "Bedrooms", "Bathroom", "Nursery", "Kids Rooms", "Closets", "Kitchen", "Cabinets", "Hallways" and "Basements." [13] In both commercials, the scrolling list is placed on the left side of the screen and the list scrolls from bottom to top, one word on top of another. Defendants' list scrolls at a noticeably faster pace. Some words appear in both lists; some are different. Defendant contends that this scrolling list contains unprotectable facts, constitutes a scenes a faire, and triggers the merger doctrine, the unprotectable idea being the "[F]lexible and varied uses around [the] household." Opp., Ex. 10.

Here, the segment attempts to convey the idea that the lights can be used in a variety of places. The technique of putting single words on screen to punctuate the potential uses/locations for the Light may be considered scenes a faire for a direct marketing commercial, but the actu-

al method of expression used by Plaintiff—the scrolling of words on the left side from bottom to top is not so indispensable in the treatment of this idea. The merger doctrine has no application. Clearly, there are several ways of conveying this idea, *e.g.*, use of flashing words, scrolling a list on bottom of screen from left to right, etc. Next, the list may arguably be considered a compilation of facts (although it is really more of a compilation of ideas), but Plaintiff is not arguing that Defendants' list violated Plaintiff's copyright. The Court finds that Defendants' commercial is substantially similar to the expressive idea contained in Plaintiff's scene in that both contain a segment that uses a scrolling list of words (highlighting the possible uses/locations for the Light) that is located on the left side of the screen and moves in an upwardly direction.

**Alleged Similarity No. 5:** *Tap Lights mounted along a dark indoor staircase, with a child climbing down the stairs*

Plaintiff's commercial depicts a nighttime scene where a young six or seven year old boy walks down an indoor carpeted staircase. The Lights, placed on the floor against the wall on every other step, illuminate the way for the boy. The narration says "Use it to illuminate a dark stairwell." Defendants' commercial also contains a nighttime scene where a young six or seven year old boy walks up an indoor carpeted staircase. As he climbs the stairs, he turns on Lights mounted on the upper edge of the handrail. The words "UPSTAIRS AND DOWN" appear on the lower right of screen.

Defendants contend that the merger doctrine applies. This contention has no merit. Here, the idea is that the Light can be used to illuminate a stairwell. There are several ways to express this idea. For example, an actor need not be present in the scene at all. Alternatively, one or more adults could be depicted going up or down the stairs. However, Defendants chose a scene that is substantially

---

**13.** Defendants' commercial capitalizes all the letters.

similar or virtually identical to Plaintiff's scene in that they both contain a young boy walking up or down an indoor carpeted stairwell.

### Alleged Similarity No. 6: *Tap Lights mounted along an outdoor walkway*

Plaintiff's commercial contains a nighttime outdoor scene showing Lights placed in a straight line on the ground along the right edge of the walkway (from the viewer's perspective). The walkway leads up to the front entryway of a house. The front "door" is actually a double or paired door. Defendants' commercial contains a similar nighttime outdoor scene. However, the Lights on the ground are aligned on both sides of the walkway leading to the front entryway to a house. The house also has a double door. The scene shows a person walking into the house. The accompanying narration states: "to provide light for an outdoor party or walkway" or "and look what we've done with this walkway!"

The Court rejects Defendants' contention that the idea that the Light can be used on the grounds outdoors is merged with this expression. This idea can be expressed in a number of ways. But Defendants' commercial looks and feels the same as Plaintiff's in this respect. Defendants' commercial is substantially similar to the expressive ideas contained in Plaintiff's commercial in that they both contain: (1) Lights aligned on the edge of a walkway leading up to the front door of a house; (2) a virtually identical background—no person or a single person with no other activities; and (3) the use of an identical type of front door.

▊ In sum, applying analytic dissection under the extrinsic test, the Court finds that the two commercials contain substantially similar scenes.[14] As for the intrinsic test, "the relevant inquiry is whether 'an ordinary viewer would perceive a substantial taking of protected expression.'" *See Columbia Pictures Industries, Inc. v. Miramax Films Corp.*, 11 F.Supp.2d 1179, 1186 (C.D.Cal.1998). Defendants point to the fact that their commercial contains numerous other original scenes not mentioned above. While that is true, "[a]nalytic dissection of the dissimilarities as opposed to the similarities is not appropriate" under the intrinsic test. *Data East,* 862 F.2d at 208. The test considers whether substantial similarity exists in the "'total concept and feel of the works.'" *Id.* A dissection of the dissimilarities is inappropriate "because it distracts a reasonable observer from a comparison of the total concept and feel of the works." *Id.*

---

**14.** With respect to the two remaining alleged similarities—no. 7 (child's hand reaching up and clicking a wall-mounted Light); and no. 9 (Light used during storm with narration), the Court rejects Plaintiffs' contention that they are substantially similar to the scenes in Defendants' commercial.

As to alleged similarity no. 7, Plaintiff's commercial depicts a child's hand reaching up to a wall-mounted Light just under a regular light switch. The narrator says "They adjust so they are always in reach." Defendants' commercial contains two separate scenes showing a child reaching up to a wall mounted Light: (1) A boy climbs onto the edge of a couch in a room to reach for the top of a tall torch style lamp with the narration "Watch out! That's a parent's nightmare!" and (2) A boy in a room turns on the Light mounted on the wall above a child-size table and then sits down. Defendants' expression

of the idea that a child can safely reach the Light (because it can be mounted anywhere at any height) is quite different from Plaintiff's expression.

Similarly, Defendants' expression of the idea of using the Light when the power goes off in a storm is different. One of the obvious benefits of having battery-operated lights in the house is that they are unaffected by a power outage. Plaintiff does not have a protectable interest in this idea. Plaintiff's commercial contains a dark indoor scene with a close up shot of a hand reaching over to turn on the Light sitting on a window sill. Outside the window, the rain is pouring down. In contrast, Defendant's commercial depicts a man walking with a candle in a dark room. The man walks to a fuse box located against the wall, reaches for the Light mounted on the wall above the box and turns it on. These scenes are not substantially similar.

While Plaintiff's entire commercial may not deserve the broad protection given to wholly fictional and dramatic works, it also does not deserve "thin" protection. The many elements deserving of protection discussed above are the equivalent of mini-dramatic works that involve plot, setting and characters. As such, those scenes deserve broader protection. Taken as a whole, the Court finds that an ordinary person could perceive a substantial taking of protected expression. Indeed, in certain areas Defendants appear to have lifted wholesale creative elements from Plaintiff's commercial. Because Plaintiff need only show a probability of success on the merits, the Court holds that Plaintiff has established that it is entitled to a preliminary injunction on its copyright claim.

## C. Lanham Act Claims

### 1. Unfair Competition under 15 U.S.C. § 1125(a)(1)(A)

■ Plaintiff alleges that Defendants' production and airing of a confusingly similar commercial violates 15 U.S.C. § 1125(a)(1)(A) because Defendants' commercial is causing confusion among consumers as to the source of the product that they purchase. Plaintiff submits declarations from its telemarketing agents that show the existence of actual confusion—customers who purchased Defendants' Click Lights called Plaintiff's customer service agents to complain about their purchase. *See* Del Toro Decl. ¶¶ 3–4; Avelar Decl. ¶¶ 3–4. According to the telemarketing agents, virtually all callers call to complain that they did not know they would be charged approximately $70 for a membership to America's Advantage. *Id.* Plaintiff claims that such confusion has irreparable damaged its business reputation, "which has been carefully built up through years of successful product marketing campaigns." Motion at 6.

The relevant portions of the Lanham Act makes it unlawful for:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin ... which ... (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A). In this case, Plaintiff has not alleged the existence (and infringement) of any trademark, service mark, trade name or trade dress. *See* Complaint. But all of the cases cited by Plaintiff in support of its Lanham Act unfair competition (from confusion of source) claim involve allegations of trademark or trade dress violation. *See* Motion at 10–11 (citing *Metro Publishing, Ltd. v. San Jose Mercury News*, 987 F.2d 637 (9th Cir. 1993)) (trademark infringement action between the publisher of a weekly tabloid and the San Jose Mercury News), *abrogated on other grounds recognized by Roe v. Anderson*, 134 F.3d 1400, 1402 n. 1 (9th Cir.1998); *Americana Trading, Inc. v. Russ Berrie & Co.*, 966 F.2d 1284 (9th Cir.1992) (manufacturer of stuffed wedding bears brought trademark infringement against competitor for using identical mark—"Wedding Bear"); *HMH Publishing Co. v. Brincat*, 504 F.2d 713 (9th cir. 1974) (trademark infringement action against the defendant's use of the terms "Playboy" and "Bunny" in connection with various automobile businesses); and *Telebrands Corp. v. E. Mishan & Sons*, 46 U.S.P.Q.2d 1493, 1505–08 (S.D.N.Y.1997) (concluding that plaintiff has demonstrated likelihood of success on its trade dress claim because its SAFETY CAN can opener has a strong and distinctive trade dress, the trade dress of defendant's PERFECT CAN can opener closely resembles SAFETY CAN's trade dress and defendant's direct marketing commercials are so similar to plaintiff's commercials that consumers confuse defendant's can opener for plaintiff's can opener). As a result, the Court had doubts about whether Plaintiff

can maintain this claim. Accordingly, the Court asked for additional briefing on this issue. *See* 2/24/00 Minute Order at 4.

In response, Plaintiff argues that the plain language of § 1125(a)(1)(A) does not require the existence of any trademark or trade dress. Reply at 10–11. Since television commercials are a combination of words, terms and symbols, Plaintiff contends that the use of such combination that is likely to cause confusion as to the origin or goods, without more, violates the Lanham Act. However, Plaintiff cites no cases that support this position.[15] Under the circumstances, the Court finds that Plaintiff has not established that it is likely to prevail on this claim.[16]

### 2. False or Deceptive Advertising Under 15 U.S.C. § 1125(a)(1)(B)

■ In order to prevail on a false advertising claim under 15 U.S.C. § 1125(a)(1)(B), the plaintiff must prove the following: (1) in its advertisements, defendant made false statements of fact about its product; (2) those advertisements actually deceived or have the tendency to deceive a substantial segment of their audience; (3) the deception is materi-

al (in that it is likely to influence the purchasing decision); (4) defendant caused its deceptively advertised good to enter interstate commerce; and (5) plaintiff has been or is likely to be injured. *Cook, Perkiss & Liehe v. Northern California Collection Service, Inc.*, 911 F.2d 242, 244 (9th Cir.1990). Preliminarily, the Court addresses Defendants' argument that Plaintiff lacks standing to assert this claim. Opp. at 13; Motion to Dismiss at 2–3. Defendants concede that Plaintiff and Defendants are competitors with respect to the Light. Opp. at 13. Defendants' argument is based wholly on the contention that Plaintiff does not have a competing discount buying club. For the reasons stated in Plaintiff's Reply, the Court rejects this argument. *See* Reply at 12–13.

Plaintiff argues that Defendants' commercial contains false statements regarding the price of the America's Advantage buying club memberships. First, Plaintiff alleges that Defendant's commercial fails to inform consumers as to the price of the America's Advantage after the initial 30–day "free" period and how to cancel the membership within the 30–day period. Motion at 12. Based on a single phone call

**15.** Contrary to Plaintiff's assertion, *Telebrands* and *Chuck Blore* are not "directly on point." *See* Reply at 10. First, as the Court already noted in a parenthetical in this section, *Telebrands* involved a trade dress infringement claim. *See* text, *supra*, at 1073. The confusion of source caused, *inter alia*, by the defendant's similar commercial, showed that the plaintiff will likely prevail on its trade dress claim. 46 U.S.P.Q.2d at 1505–1508, 1997 WL 232595.

Second, the *Chuck Blore* court's analysis of the plaintiffs' 15 U.S.C. § 1125(a) claim is unsatisfactory. That district court never discussed the issue of concern here. Also, the Court notes that the *Chuck Blore* court relied on the Federal Circuit's test for a Lanham Act unfair competition claim. 674 F.Supp. at 680–81 (citing *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1444–45 (Fed.Cir. 1984).) That test requires a plaintiff to establish three elements: (1) the trade dress or product configuration of the competing products is confusingly similar; (2) the appropriated features of the trade dress or product configuration are primarily nonfunctional; and (3) the trade dress or product configuration

has obtained secondary meaning. *Litton Systems,* 728 F.2d at 1444–45 (concerning configuration of microwave ovens). Here, even if the Court were to adopt this test for Plaintiff's Lanham Act unfair competition claim, the Court finds that Plaintiff will not likely prevail on this claim. No trade dress is at issue. Also, Plaintiff cannot rely on an allegedly confusing "product configuration" since Defendants are entitled to sell the exact same light.

**16.** The Court also notes that Plaintiff's commercial contains no words or symbols that identify the company that actually sells the Tap Light. Nowhere in the commercial does the narrator advise the audience that the product is being sold or sponsored by Smart Inventions. Similarly, nowhere in the commercial do the words "Smart Inventions" appear. (Defendants' commercial does identify "International Brands Marketing" with a copyright sign at the end.) Based on this, the Court cannot fathom how Plaintiff can claim that it has established a reputation with consumers over the years and the confusion caused by Defendants' commercial has injured Plaintiff's business reputation.

by Plaintiff's counsel, Plaintiff also alleges that Defendants' telemarketing sales people do not provide information as to these matters during the telephone order. *Id.* at 13; 2/18/00 Graves Decl. ¶ 11. Plaintiff further supports this claim with declarations from its telemarketing staff indicating that consumers call Plaintiff to complain that they were not aware they would be enrolled in Defendants' buyers discount club. *See* Del Toro Decl. ¶¶ 3–4; Avelar Decl. ¶¶ 3–4.

In response, Defendants submitted declarations showing that (1) the videotape of Defendants' commercial submitted by Plaintiff does not reflect the version that was run for the public. Opp., ex. 1 [Kravets Decl.] ¶ 6. Defendants claim that the version that was actually aired to the public contained a detailed disclaimer concerning the 30–day "free" trial membership.[17] After reviewing the videotape submitted by Defendants, the Court agrees. The disclaimer, displayed in readable text on the bottom of the screen during the last 27 seconds, states the following:

> After the free trial period unless you call to cancel your credit card will be billed $96 each year which is your monthly fee of only $8 billed annually in advance to the credit card you are using today. You will receive notification each year if your fees are charged for the next year or you can call and cancel and you won't be charged.

In addition, Defendants submitted declarations showing that the script followed by their telemarketing staff advises callers that they will be enrolled in the discount buyers club, the membership fees of $6 per month is billed annually in advance to the credit card used that day and the customer can cancel the membership by calling a toll-free number within the first 30 days. *See* Opp., Ex. 1 [Kravets Decl.] ¶ 8; Ex. 3 [Gudenrath Decl.] ¶ 4; Ex. 4 [King Decl.] ¶ 4. There appears to be a discrepancy as to the amount of monthly fees—$ 9 a month advertised on commercial and $ 6 a

month stated in the script. However, Plaintiff's false advertising claim is not based on this apparent discrepancy.[18] At this time, based on the evidence submitted by Defendants, the Court cannot conclude that Plaintiff will likely succeed on the merits of the false advertising claim insofar as it is premised on omissions concerning the discount buying club.

Second, Plaintiff alleges that Defendants' commercial contains the following false statement: Telling the viewers that the first 500 people to respond to the commercial will be part of Defendants' "market research group" and "will get six Click Lights absolutely free" (except for shipping and handling) when (1) there is no such market research group and (2) everyone who responds, regardless of whether they are part of the first 500 people, can get six Click Lights free. Motion at 14. In response to the contentions concerning the marketing research statement, Defendants submit declarations stating that the shipping agent ships a marketing survey questionnaire with each order of the Click Lights pursuant to Defendants' instructions. 2/21/00 Kravets Decl. ¶ 12; Opp., Ex. 1 [Kravets Decl.] ¶¶ 3, 9; Ex. 5 [Tuppatsch Decl.] ¶ 2–3; Plaintiff then counters with a declaration from counsel stating that he did not receive a marketing survey questionnaire with his single Tap Light order. 3/10/00 Graves Decl. ¶ 2. Based on this evidence, the Court finds that it cannot conclude that Plaintiff will likely prevail on its false advertising claim insofar as it is premised on whether Defendants in fact sends market survey questionnaires to Click Light customers.

 However, with respect to the veracity of the statement that only the first 500 people are entitled to the "free" offer, Defendants concede that they have sent six "free" Click Lights to every purchaser, irrespective to whether they are the first 500 people to respond to the

---

17. In the Reply, Plaintiff does not dispute this.

18. This question of fact may be relevant at a later stage in the case.

commercial, "because of the overwhelming response" from viewers. 2/21/00 Kravets Decl. ¶ 13. The deceptive advertising provisions of the Lanham Act "is designed to protect the right of the consumer to be told the truth." 4 McCarthy on Trademarks § 27:25. At least one court has held that advertising special "promotional" prices for goods when those goods have never been sold at any other price is actionable as deceptive advertising under 15 U.S.C. § 1125(a)(1)(B). *See B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 857 F.Supp. 1241, 1242, 1247 (N.D.Ill.1994) (holding that plaintiff has stated a claim for deceptive advertising under the Lanham Act based on defendants' statement in advertisement that certain items of jewelry were on sale for 50% off their regular prices where the items have never been sold at the stated "regular" prices).[19] Defendants have cited no cases to the contrary. Therefore, at this time, the Court finds that Plaintiff has established that it probably will prevail on the deceptive advertisement claim,[20] insofar as it relies on the limited-time offer statement.[21]

### III. Conclusion

For all of the foregoing reasons, the Court will GRANT Plaintiff's application for a preliminary injunction. Rather than the broad injunction requested by Plaintiff,[22] the injunction shall only enjoin Defendants from airing the current version of their commercial for the reasons set forth above. The injunction is conditioned on a bond in the amount of $ 25,000. Plaintiff is ORDERED to file and serve (personally or via facsimile) a Proposed Injunction, as well as Findings of Fact and Conclusions of Law consistent with this opinion by Monday, April 3, 2000.[23] Defendants should submit any objections as to form within five (5) court days after receipt of Plaintiff's proposed papers. The Court will issue its preliminary injunction upon receipt and consideration of the parties' papers.

**SO ORDERED.**

---

19. The Court notes that Plaintiff's commercial similarly promises that only callers who call within the "next 10 minutes" will receive six Tap Lights (instead of four) at the special price of $19.95. The extra two "free" Tap Lights is part of the "special introductory offer." The record suggests that all of Plaintiff's customers, irrespective of whether they call in the "next 10 minutes" of the commercial, receive six Tap Lights for $19.95.

20. Evidence of specific harm is not needed to obtain injunctive relief under 15 U.S.C. § 1125(a)(1)(B). 4 McCarthy on Trademarks § 27:28 (citing *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 12 U.S.P.Q.2d 1779, 1790 (9th Cir.1989)). The Court finds that Plaintiff has established that Defendants' false statements have caused or will cause it to suffer loss of sales.

21. Plaintiff also asserts a state unfair competition claim (Cal.Bus. & Prof.Code § 17200)

and a state false advertisement claim (Cal. Bus. & Prof.Code § 17500). Under § 17200, "unfair competition" broadly includes "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500)...." Cal.Bus. & Prof.Code § 17200. Based on the above discussion, the Court finds that Plaintiff has established probable success on the merits of these claims insofar as they are based on Defendants' alleged copyright violation and Defendants' advertisement concerning the "special" offer to the first 500 callers.

22. *See* Plaintiff's proposed order, lodged February 22, 2000.

23. In addition to filing the documents referenced above, Plaintiff is ORDERED to submit to the Court a copy of those documents on disk formatted for Wordperfect 7.0.