**SONY PICTURES ENTERTAINMENT, INC., et al., Plaintiffs,**

v.

**FIREWORKS ENTERTAINMENT GROUP, INC., et al., Defendants,**

**And Related Cross Action.**

**CV No. 01–0723 ABC (AIJX).**

United States District Court, C.D. California, Western Division.

July 16, 2001.

See also 137 F.Supp.2d 1177.

Mark S. Lee, Seth A. Gold, Manatt, Phelps & Phillips, Los Angeles, CA, for Plaintiffs.

Jeffrey S. Kravitz, Keith G. Wileman, Lord, Bissell & Brook, Los Angeles, CA, for Defendants.

ORDER GRANTING IN PART DEFEN-
 DANTS' MOTION FOR SUMMARY
 JUDGMENT OR SUMMARY ADJU-
 DICATION ON PLAINTIFFS'
 CLAIMS AND GRANTING IN
 PART PLAINTIFFS' MOTION TO
 DISMISS, FOR SUMMARY JUDG-
 MENT, OR TO STRIKE.

COLLINS, District Judge.

Defendants Fireworks Entertainment Group, Fireworks Communications Inc., Fireworks Productions, Inc., Paramount Pictures, and Mercury Entertainment's (collectively "Defendants") Motion for Summary Judgment or Summary Adjudication on Plaintiffs' Claims, as well as Plaintiffs Sony Pictures Entertainment, Inc. ("Sony"), TriStar Pictures, Inc.

("TriStar"), and Zorro Productions, Inc.'s ("ZPI") (collectively "Plaintiffs") Motion to Dismiss, for Summary Judgment, or to Strike came on regularly for a hearing before this Court on July 16, 2001. This case arises out of a dispute between Plaintiffs and Defendants about a television series, "Queen of Swords" ("QOS"). After considering the materials submitted by the parties, argument of counsel, and the case file, the Court GRANTS IN PART Defendants' Motion and Plaintiffs' Motion as described herein.

## I. PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint on January 24, 2001. Plaintiffs allege eight claims for relief: (1) infringement of Sony's copyright in the "Mask of Zorro;" ("MOZ") (3)[1] infringement of ZPI's copyright in the "Zorro: Men Aren't The Only Ones With Dual Identities" comic book; (4) infringement of ZPI's copyright in the "Lady Rawhide–Book 1, Other People's Blood" comic book; (5) infringement of ZPI's copyright in the "Lady Rawhide–Book 3: It Can't Happen Here" comic book; (6) infringement of ZPI's copyright in the "Lady Rawhide–The Night They Killed Lady Rawhide" comic book; (6)[2] false designation of origin under the Lanham Act § 43(a); (7) common law unfair competition under California law; and (8) statutory unfair competition under California law. On February 26, 2001, Plaintiffs filed a Motion for Preliminary Injunction, which Defendants opposed. The Court denied Plaintiff's Motion on April 5, 2001.

On March 2, 2001, Defendants counterclaimed against Plaintiffs for: (1) invalidity of trademarks and service marks; (2) invalidity of copyrights; (3) declaratory relief; (4) statutory unfair competition; and

---

**1.** Plaintiffs have mis-numbered their claims for relief.

**2.** Again, Plaintiffs have mis-numbered their claims for relief.

(5) common law unfair competition. On the same day, Defendants answered Plaintiffs' Complaint and asserted fifteen affirmative defenses. Of the fifteen affirmative defenses, only the second through fifth are presently at issue. Those defenses are: (2) the copyrights alleged in the Complaint are invalid and unenforceable, both generally and specifically as to Defendants' QOS; (3) the trademarks and service marks alleged in the Complaint are invalid and unenforceable both generally and specifically as to Defendants' QOS; (4) the "Zorro" character is not owned by Plaintiffs or any of them; and, (5) the "Zorro" character is in the public domain.

On May 25, 2001, Defendants filed a Motion for Summary Judgment or Summary Adjudication on Plaintiffs' claims. Plaintiffs filed a Motion to Dismiss Defendants' first and third counter-claims, for Summary Judgment on Defendants' second, third, fourth, and fifth counter-claims, and for Summary Judgment on, or to Strike from Defendants' Answer, Defendants' second through fifth affirmative defenses. Each side opposed the other side's Motion, and each side filed a Reply.

## II. STANDARDS OF REVIEW

Defendants are seeking summary judgment on Plaintiff's claims, and Plaintiffs are seeking to dismiss certain of Defendants' counter-claims, summary judgment on other claims, and summary judgment on or to strike certain of Defendants' affirmative defenses. The Court therefore briefly discusses the standards for each of these types of motions.

### A. Summary Judgment

It is the burden of the party who moves for summary judgment to establish that there is "no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir.

1978). If the moving party has the burden of proof at trial (the plaintiff on a claim for relief, or the defendant on an affirmative defense), the moving party must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party. *See Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–88 (1984)). This means that, if the moving party has the burden of proof at trial, that party "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [that party's] favor." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986).

If the opponent has the burden of proof at trial, then the moving party has no burden to negate the opponent's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the moving party does not have the burden to produce *any* evidence showing the absence of a genuine issue of material fact. *Id.* at 325, 106 S.Ct. 2548. "Instead, ... the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial.

*Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the nonmovant is to be believed; and all justifiable inferences are to be drawn in favor of the nonmovant. *Id.* at 248, 106 S.Ct. 2505. However, the court must view the evidence presented to establish these elements "through the prism of the substantive evidentiary burden." *Id.* at 252, 106 S.Ct. 2505.

## B. Motion To Dismiss Standard (Rule 12(b)(6))

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. Rule 12(b)(6) must be read in conjunction with Rule 8(a) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990). A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988). Where it appears "beyond doubt" that a party "can prove no set of facts in support of [her] claim which would entitle [her] to relief," it is proper for a court to dismiss a complaint under Rule 12(b)(6). *Figueroa v. Gates,* 120 F.Supp.2d 917, 919 (C.D.Cal. 2000).

A court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986); *see also Russell v. Landrieu,* 621 F.2d 1037, 1039 (9th Cir.1980) (finding that the complaint must be read in the light most favorable to the plaintiff). However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast as factual allegations. *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981); *Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968, 973 (8th Cir.1968).

Furthermore, in ruling on a 12(b)(6) motion, a court cannot generally consider material outside of the complaint (e.g., facts presented in briefs, affidavits, or discovery materials). *Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1483 (9th Cir.1991), *overruled on other grounds by Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). A court may, however, consider exhibits submitted with the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1989). The Court may also consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir.1994).

Lastly, a Rule 12(b)(6) motion "will not be granted merely because [a] plaintiff requests a remedy to which he or she is not entitled." William W Schwarzer, et al., *Civil Procedure Before Trial* § 9:230. "It need not appear that plaintiff can obtain the *specific* relief demanded as long as the court can ascertain from the face of the complaint that *some* relief can be granted." *Doe v. United States Dept. of Justice,* 753 F.2d 1092, 1104 (D.C.Cir. 1985); *see also Doss v. South Central Bell Telephone Co.,* 834 F.2d 421, 425 (5th Cir. 1987) (demand for improper remedy not fatal if claim shows plaintiff entitled to different form of relief).

## C. Motion to Strike (Rule 12(f))

"Under Federal Rule of Civil Procedure 12(f), the Court 'may order stricken from any pleading ... any redundant, immaterial, impertinent or scandalous matter.'" *Bureerong v. Uvawas*, 922 F.Supp. 1450, 1478 (C.D.Cal.1996). The purpose of a Rule 12(f) motion is to "'avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial.'" *Id.* (citations omitted). The Court may also order stricken a Plaintiff's prayer for damages if the damages sought are not recoverable as a matter of law. *Id.* at 1479 n. 34.

## III. FACTUAL BACKGROUND [3]

In its Order denying Plaintiff's Motion for Preliminary Injunction, the Court provided a detailed description of the factual background in the instant action. *See*

*Sony Pictures Entertainment, Inc. v. Fireworks Entertainment Group*, 137 F.Supp.2d 1177, 1181–83 (C.D.Cal.2001). The Court, therefore, does not repeat its previous discussion in this Order except to the extent that it is useful to the Court's rulings on the pending Motions.[4]

The well-known fictional character "Zorro" is at the center of this action. Plaintiff ZPI claims to be the owner of all rights, including without limitation copyrights, trademarks and trade dress, both registered and unregistered, associated with Zorro.[5] (Compl.¶ 11.) Plaintiffs allege that TriStar is ZPI's exclusive motion picture licensee and is substantially owned and controlled by Sony. (*Id.* at ¶¶ 5, 14.) Pursuant to a license by ZPI to Sony, Sony produced and released in July 1998 the film MOZ which starred Anthony Hopkins, Antonio Banderas, and Catherine Zeta–Jones. ZPI also asserts copyright ownership in Zorro comic books featuring

---

**3.** The Court will first address Defendants' Motion for Summary Judgment; therefore, this section views the evidence in the light most favorable to Plaintiffs, the non-moving party.

**4.** The Court has reviewed all the objections to the evidence upon which it has relied. To the extent that the Court has relied on that evidence in this Order, the objections are OVERRULED on the merits. Objections to evidence upon which the Court does not rely are OVERRULED as moot, except as indicated herein.

In addition, the Court DENIES Defendants' Request for Judicial Notice, filed July 6, 2001.

**5.** The parties contest whether ZPI has an ownership interest in the *character* "Zorro." ZPI contends that it has such an interest, and it has presented evidence of the origin of that interest. Specifically, ZPI has presented evidence that on July 26, 1949, Johnston McCulley, the author of "The Curse of Capistrano," entered into an agreement with Mitchell Gertz which states, "McCulley hereby desires to sell, transfer and assign all rights, licenses and privileges of every kind and nature whatsoever in and to the use of the name 'Zorro' and to the character 'Zorro' in any and all

fields except magazine serialization and book publishing subject to the option above referred to...." Paragraph 1 of that Agreement states that:

> McCulley hereby gives, grants, bargains, sells, signs, transfers and sets over forever the absolute exclusive and unqualified right, license and privilege throughout the world, to Gertz, his successors and assigns to specified rights "to the character 'Zorro,' throughout the world forever, except that such rights are subject to contracts or motion picture rights entered into with Twentieth Century–Fox Film Corporation and Republic Productions, Inc. McCulley hereby represents and warrants that the motion picture rights granted to Twentieth Century–Fox Film Corporation and Republic Productions, Inc. did not include transfer of and did not transfer the exclusive rights to the use and portrayal of the character 'Zorro' in motion pictures except as to the portrayal and use of the character in the motion pictures produced by such companies for the limited time set forth in such contracts."

(Pl.Ex. 28; Declaration of Mark S. Lee ("Lee Decl.") ¶ 16.)

a character called Lady Rawhide ("LR.") (*Id.* at ¶ 12).

Defendants are the producers and distributors of the television series QOS. (*Id.* at ¶¶ 7, 8.) The QOS series features Tessa Alvarado, an aristocratic young woman who returns to California from Spain in the early 1800s upon news of her father's death. Plaintiffs claim that Defendants, through the television series QOS "copied protectable elements from Plaintiffs' famous 'Zorro' character and the 'Zorro' related works." (*Id.* ¶ 1.) Plaintiffs allege that Defendants' actions "have misled and are misleading the public into believing that their television series [QOS] is endorsed, approved of, or otherwise associated with Plaintiffs." (*Id.*) Plaintiffs seek injunctive relief to stop Defendants' conduct and money damages to remedy the alleged harm to Defendants are asserted to have caused. (*Id.* at 9:11–14, 17–23.)

## IV. ANALYSIS

### A. Defendants' Motion for Summary Judgment

Defendants seek judgment as a matter of law on all of Plaintiffs' claims for relief. They argue that there are no genuine issues of material fact supporting Plaintiffs' claims for copyright infringement [6] (claims 1, 3, 4, 5, and 6), false designation of origin under the Lanham Act (claim 6), or common law or statutory unfair competition

(claims 7 and 8). Plaintiffs argue that the Court should deny Defendants' Motion because the Court's preliminary injunction findings do not support summary judgment, Defendants' legal arguments do not support summary judgment, and material factual disputes preclude the Court from granting summary judgment. Plaintiffs request, in the alternative, that the Court continue Defendants' Motion so that discovery can be conducted pursuant to Federal Rule of Civil Procedure 56(f).

### 1. Copyright Infringement Standard

■ A plaintiff asserting copyright infringement must prove: (1) ownership of a valid copyright; and (2) infringement— that defendant copied protected elements of the plaintiff's work. *See Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 481 (9th Cir.2000); *Chase–Riboud v. Dreamworks, Inc.,* 987 F.Supp. 1222, 1224 (C.D.Cal.1997) (citations omitted). " 'Copying' is composed of two parts: '(1) circumstantial evidence of the defendant's access to the copyrighted work; and (2) substantial similarity between the copyrighted work and the defendant's work." ' *Chase–Riboud,* 987 F.Supp. at 1224. In this case, Plaintiffs have presented their copyright registrations for MOZ and the LR comics at issue, and the Court assumes for purposes of the instant Motions that Plaintiffs have valid copyrights in those works.[7] The question, therefore, is wheth-

---

**6.** While ZPI claims to own rights to the character Zorro (Compl.¶¶ 1, 11–17), Plaintiffs do not allege in their Complaint a claim for copyright infringement of the character Zorro. (Pl. Opp'n. 2 n. 3.)

In addition, the Court notes that consistent with its previous Order denying Plaintiffs' Motion for Preliminary Injunction, wherein the Court wrote, "Plaintiffs concede that they own no copyright in the character Zorro," *Sony,* 137 F.Supp.2d at 1185 & n. 9, Plaintiffs admit "there is no copyright *in* the character [Zorro] per se." (Plaintiffs' Statement of Genuine Issues ("SOG") ¶ 46.) Instead,

Plaintiffs rely on copyrights in works featuring or depicting the character Zorro to show United States copyright "in the character 'Zorro' to the extent that character is more fully delineated in subsequent works that remain in copyright." (Motion for Preliminary Injunction ("MPI") Pl. Exs. 7, 9, 12, 13, 39, 58; MPI Curtis Decl. ¶ 15.)

**7.** It appears that the parties dispute the copyrights in the LR comic books, not the copyright in MOZ. Defendants argue that ZPI's failure to mention on the copyright registrations that the LR comic books were derivative

er the series QOS copied protected elements of MOZ or LR. With no *direct* evidence of copying, both "access" and "substantial similarity" must be proven; however, in the instant case, the Court presumes access. Defendants do not dispute that they had access to MOZ and the LR comic books at issue.[8]

■ Copyright infringement is a measure of the extent to which an allegedly infringing work represents "copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). In other words, it is only copying of *copyrightable* elements of a plaintiff's work that is answerable under the federal Copyright Act. "The mere fact that a work is copyrighted does not mean that every element of the work may be protected. Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author." *Id.* at 348, 111 S.Ct. 1282. Thus, "[n]ot all copying . . . is copyright infringement." *Id.* at 361, 111 S.Ct. 1282. Whether original expression has been copied is a case by case determination.

Therefore, " '[s]ubstantial similarity' refers to similarity of expression, not merely similarity of ideas or concepts," *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1398 (9th Cir.1997) (citing 17 U.S.C. § 102(b)), and only "protected expression" is relevant for purposes of assessing "substantial similarity." *See Shaw,* 919 F.2d at 1361. "As we recognized long ago[,] . . . similarities derived from the use of common ideas cannot be protected; otherwise, the first to come up with an idea will corner the market." *Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1443 (9th Cir.1994). "[T]he party claiming infringement may place '*no* reliance upon any similarity in expression resulting from' unprotectable elements.' " *Id.* (quoting and adding emphasis to, *Aliotti v. R. Dakin & Co.,* 831 F.2d 898, 901 (9th Cir.1987)). "[T]he unprotectable elements have to be identified, or filtered, before the works can be considered as a whole." *Id.*

■ The Ninth Circuit uses a two-part test to determine "substantial similarity." First, the extrinsic, objective test "objectively considers whether there are substantial similarities in *both* ideas and expression." *Apple Computer,* 35 F.3d at 1442; *see also Smart Inventions, Inc. v. Allied Communications Corp.,* 94 F.Supp.2d 1060, 1065 (C.D.Cal.2000). Second, the intrinsic, subjective test looks for

works means that the Plaintiffs may not enforce their alleged copyrights. (Def.Mtn.7–8.) The Court notes, however, that only one of the LR comic books mentions Zorro, and even if that comic book (or any of the others at issue) were considered a derivative work, it could still be entitled to copyright protection. *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.,* 122 F.3d 1211, 1218–19 (9th Cir.1997). The Court therefore declines at this time to find invalid Plaintiffs' copyrights in the LR comic books.

Defendants also argue that Plaintiffs have misused their alleged copyright ownership in Zorro. (*Id.* at 8–9.) Misuse of copyright does not invalidate a copyright but precludes its

enforcement during the period of misuse. *Practice Management Information Corp. v. American Medical Ass'n,* 121 F.3d 516, 520 & n. 9 (9th Cir.1997). The Court is unable to find at this time that, as a matter of law, Plaintiffs have used a "copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office." *Id.* at 520. The Court, therefore, in viewing the facts in the light most favorable to Plaintiffs, assumes for purposes of this motion that Plaintiffs have valid copyrights in MOZ and the LR comic books at issue.

8. The Court discusses the "pitch-kit," which includes clips that were directly copied from MOZ, separately.

substantial similarity in the "total feel and concept of the works." *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 208 (9th Cir.1988) (citation and internal quotation marks omitted). While courts often engage in "analytic dissection" for the objective, extrinsic test, the subjective, intrinsic test asks "whether the ordinary, reasonable person would find the total concept and feel of the works to be substantially similar." *Three Boys Music*, 212 F.3d at 485.

Only the extrinsic test is generally employed at the summary judgment stage because the intrinsic test is generally reserved for the finder of fact. *See, e.g., Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir.1994); *Three Boys Music*, 212 F.3d at 485. "A plaintiff avoids summary judgment by satisfying the extrinsic test which makes similarity of the works a triable issue of fact.... [A] plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Kouf*, 16 F.3d at 1045; *see Shaw*, 919 F.2d at 1359–61 (creating this rule).

■ The extrinsic test usually requires "analytic dissection," and may be helped by the testimony of experts. *See Three Boys Music*, 212 F.3d at 485; *Dr. Seuss Enterprises*, 109 F.3d at 1398 n. 3 (" 'Analytic dissection' focuses on isolated elements of each work to the exclusion of other elements, combination of elements, and expressions therein.") Analytic dissection requires breaking the works compared down into their constituent elements, and comparing those elements for

proof of copying as measured by substantial similarity. It is the copyright plaintiff's burden to identify the elements for this comparison. *See, e.g., Three Boys Music*, 212 F.3d at 485 ("Initially, the extrinsic test requires that the plaintiff identify concrete elements based on objective criteria."). Though the elements compared may vary based on the types of works compared, in literary or dramatic works typical objective elements include plot, theme, dialogue, mood, setting, pace, characters, and sequence of events. *See Kouf*, 16 F.3d at 1045; *Shaw*, 919 F.2d at 1359, 1362 (citations omitted); *Smart Inventions*, 94 F.Supp.2d at 1065. Plaintiffs rely on these typical literary elements for comparison in the instant case.

■ In comparing these elements, the Court must filter out any parts of the copyrighted work which are not protected. "Because only those elements of a work that are protectable and used without the author's permission can be compared when it comes to the ultimate question of illicit copying, [the Court uses] analytic dissection to determine the scope of copyright protection before works are considered 'as a whole.' " *Apple Computer*, 35 F.3d at 1443. First, therefore, "[a]nalytic dissection requires the court to separate unprotectable facts and ideas from potentially protectable expressions." *Smart Inventions*, 94 F.Supp.2d at 1065–66; *see Apple Computer*, 35 F.3d at 1443.[9] Second, "the court must then apply the relevant limiting doctrines in the context of the particular medium involved, through the eyes of the ordinary consumer of that product." *Apple Computer*, 35 F.3d at 1443. These "limiting doctrines" include the "merger"

9. It is undisputed that Zorro appears in works whose copyrights have already expired, such as McCulley's story "The Curse of Capistrano" and Fairbanks's movie, "The Mark of Zorro." As these works have already entered the public domain, the portions of MOZ and LR comic books that use elements from McCulley's story or elements from Fairbanks' movie cannot be infringed except as far as MOZ or LR have incorporated original elements.

and *"scenes a faire"* [10] doctrines. *Id.* at 1444. Finally, "[h]aving dissected the alleged similarities and considered the range of possible expression, the court must define the scope of the plaintiff's copyright—that is, decide whether the work is entitled to 'broad' or 'thin' protection." *Id.* at 1443. This "scope of protection" sets the appropriate standard for a subjective comparison of the works to determine whether, as a whole, they are sufficiently similar to support a finding of illicit copying. *Id.*

### a. Substantial Similarity to MOZ

■ Plaintiffs allege that MOZ and QOS are similar in terms of characters, plot and sequence of events, mood, setting, pace, and theme, and that MOZ and QOS "share a number of similar scenes that depict similar stunts, set dressings, actions, and/or camera angles." (Pl. Opp'n 6–9.) Plaintiffs also allege, and Defendants do not dispute, that Defendants copied portions of MOZ to create a "pitch-kit" video

to promote the QOS series. (Compl. ¶ 16(a).) [11]

Previously, the Court denied Plaintiffs' Motion for Preliminary Injunction after evaluating similarities between MOZ and QOS under the extrinsic and intrinsic tests for substantial similarity. As the Court has explained, however, the Court's inquiry on a motion for summary judgment is different. On summary judgment, only the Court's assessment of substantial similarity under the extrinsic test is important. Under the extrinsic test, and in light of Defendants' MOZ-clip-laden "pitch-kit" video which is now before the Court,[12] the Court cannot find that MOZ and QOS and its "pitch-kit" are dissimilar as a matter of law. The Court notes that, in addition to Defendants' actual copying of MOZ in the "pitch-kit" video, Plaintiffs have pointed to similarities between the villains and the plot/sequence of events in MOZ and QOS such that a reasonable jury could find substantial similarity between the works.

10. *Scenes a faire* are forms of expression that are " 'as a practical matter indispensable, or at least standard in the treatment of a given [idea].' " *Apple Computer,* 35 F.3d at 1444 (citation and internal quotation marks omitted). *See also* 4 *Nimmer* § 13.03[B][4] at 13–73 ("similarity of incidents or plot that necessarily follows from a common theme or setting."). Though what may constitute *scenes a faire* will vary depending on the medium and the subject matter of the particular copyrighted work at issue, the question is whether that particular expression is so typical of the genre as to be "indispensable."

11. Plaintiffs allege that Defendants' "pitch-kit" video infringed MOZ as part of the first claim for relief. In response to this Court's Order dated July 2, 2001, Defendants filed a copy of the "pitch-kit" video that includes clips from MOZ. Defendants also filed a copy of the revised "pitch-kit" video wherein the clips from MOZ were excerpted and replaced with other footage, mostly from QOS. The Court has reviewed both of these "pitch-kit" videos. The Court notes that while each individual clip of MOZ used in the original "pitch-kit" may only be a few seconds in

length, it appears that the bulk of the video consists of MOZ clips that have been strung together to "pitch" QOS. Plaintiff's use of MOZ footage becomes particularly obvious upon review of the revised "pitch-kit" video, wherein clips of QOS actors are used in place of the MOZ footage. Because it appears that most of the original "pitch-kit" video is comprised of footage from MOZ, the Court cannot find at this time that, as a matter of law, Defendants' copying was *de minimis,* i.e., that copying has occurred to such a trivial extent so as to fall below the quantitative threshold of substantial similarity. *See De Bautuc v. Spelling Television,* No. CV–98–6002, at 5 (C.D.Cal.1998) (citing *Ringgold v. Black Entertainment Television,* 126 F.3d 70, 74 (2d Cir.1997)).

12. The Court previously noted that because Plaintiffs did not allege in their Complaint that the "pitch-kit" video clips were still being shown, the use of the film clips as part of a "pitch-kit" was not at issue for purposes of Plaintiff's Motion for Preliminary Injunction. *Sony,* 137 F.Supp.2d at 1182 n. 4.

The Court therefore DENIES Defendants' Motion for Summary Judgment with respect to Plaintiffs' first claim, for copyright infringement in MOZ.

### b. Substantial Similarity to LR

■ As the Court has explained, "for summary judgment, only the extrinsic test [for substantial similarity] is important.... [A] plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Kouf,* 16 F.3d at 1045. The Court, therefore, compares the series QOS and the four LR comic books at issue under the objective criteria of the extrinsic test. *Id.* On that basis alone, the Court finds that QOS and the LR comic books are dissimilar as a matter of law.

### (1) Characters and dialogue

Plaintiffs allege that QOS copied characters from LR. Specifically, Plaintiffs argue that QOS copied LR to create the QOS series. (Pl. Opp'n 10.) Previously, in their Motion for Preliminary Injunction, Plaintiffs also argued that QOS copied the LR character Scarlett Fever to create Mary Rose and the LR character Machete to create Serpente.[13]

### (i) LR–QOS

The Court has examined the LR comic books and excerpts submitted in this case in light of the extrinsic test for substantial similarity. The Court finds that no reasonable jury could find substantial similarity between the QOS characters and the LR characters. Other than the fact that LR and QOS have dual identities, itself an unprotectable concept, the Court finds no substantial similarity between LR and QOS. LR appears scantily clad in a red costume with red hair and QOS appears, by comparison, with dark hair, looking demure and almost fully covered in a black costume. Additionally, Plaintiffs' argument that LR and QOS "engage in highly sensual swordplay with their male antagonists," understates the constant, blatant sexual overtones to LR's actions and overstates by far the occasional, playful sensual undertones to QOS's actions. In fact, Plaintiffs' comparison comes close to misrepresentation of both characters.

### (ii) Scarlett Fever–Mary Rose

The Court similarly finds that no reasonable jury could find substantial similarity between LR's Scarlett Fever and QOS's Mary Rose. Apart from the fact that they are both sword-wielding sea-women, another unprotectable idea, they are quite dissimilar. Scarlett Fever is a ruthless pirate, about LR's age, who has an obsession with, and takes great pleasure in, killing her enemies by stabbing them with a gangrenous weapon. Her behavior and dialogue are sexually charged. Mary Rose, on the other hand, is a mercenary sea captain who fought against pirates and has commissions from England and Spain. Rather than being a contemporary of the QOS, she is a wealthy widow of a "certain age" whose adult son has been arrested for killing a young woman. Mary Rose arrives in town following her son's arrest to discourage Tessa Alvarado from testifying against him at his trial. She does not engage in any sexual dialogue or meta-

---

13. Plaintiffs appear to argue only similarity between LR and the QOS in opposition to Defendants' Motion for Summary Judgment. (Pl. Opp'n 10.) Nevertheless, the Court addresses whether the other characters previously identified in connection with Plaintiffs' Motion for Preliminary Injunction are similar.

Defendants, rather than addressing whether any similarities exist, merely question the validity of Plaintiffs' copyrights in the LR comic books at issue.

phor. Her sole purpose is to save her son. In the course of the show, she first threatens but then befriends Tessa Alvarado. Even though both Scarlett Fever and Mary Rose have long blonde hair, any similarity of appearance stops there. Scarlett Fever always appears dressed quite provocatively, in a blouse fastened only by a knot at her waist above skin-tight pants licked with flames. Mary Rose, by comparison, is fully covered, wearing not only a fully buttoned, long-sleeved, white blouse, but also a brown vest, and brown pants.

### (iii) Machete–Serpente

Plaintiffs' claim regarding similarity between LR's Machete and QOS's Serpente is meritless, as it fails to even articulate similarities as to plot, theme, character, or dialogue. The only similarities the Court has found between the two characters are that both characters are villains and they both wear two machetes strapped to their back in the shape of an "X." In fact, it is clear to the Court that the two characters look nothing alike. Plaintiffs' Machete is large, burly, and bald. Serpente is thin, often wears a hat, but clearly has hair. Plaintiffs do not even hint at any plot similarities between Machete's role and the conflicts and sword-fight between QOS and Serpente, culminating in Dr. Helm's killing of Serpente to save QOS.[14] The fact that both villains wear crossed machetes on their backs is clearly not enough for the Court to find substantial similarity.

### (2) Theme

When comparing LR to QOS, Plaintiffs characterize the theme of QOS and LR as "violently avenging wrongs done to family members." (Pl. Opp'n 11; MPI McGregor Decl. ¶ 16.)[15] Plaintiffs seem to argue that the QOS seeks revenge for her father's death[16] just as LR seeks revenge for the blindness visited on her brother. This thematic characterization, however, overlooks the important fact that in the LR stories, Zorro is a target of LR's revenge. LR believes, erroneously of course, that Zorro was involved in blinding her brother. Even if the Court overlooks this glaring thematic difference and assumes similarity of themes between QOS and LR, the theme of avenging wrong done to family members remains an unprotectable idea. *Id.* The Court therefore finds that the similarity of themes in LR and QOS does not extend to elements of protectable expression.

### (3) Plot/Sequence of Events

The only *event* in QOS that Plaintiffs point to as infringing LR occurs when QOS jumps off the cliff, following her discovery of Montoya's soldiers near the gold

14. In opposition to Defendants' Motion for Summary Judgment, Plaintiffs submit a copy of the comic book "Zorro: The Lady Wears Red." (Declaration of Don McGregor ("McGregor Decl.") Ex. A.) This comic book includes the comic entitled, "Zorro: Men Aren't The Only Ones With Dual Identities," which is one of the comic books in which Plaintiffs claim infringement. This comic book pictures the villain Machete; however, Plaintiffs again provide no analysis of any plot similarities between LR and QOS. The Court has itself reviewed the comic book for any such similarities and finds none.

15. Plaintiffs' arguments regarding themes in QOS are somewhat contradictory. Plaintiffs argue that QOS has a theme of overcoming personal revenge when comparing it to MOZ, but argue the theme of taking violent personal revenge, when comparing QOS to LR.

16. The Court, however, is not convinced that the QOS could really be seeking revenge for her father's death because she was told he died in a horse riding accident. Although she does not accept this explanation as the truth, and she seeks to investigate the facts surrounding his death, she has not learned the truth of how he died in the episodes viewed so far.

mine, and survives. Plaintiffs point to a comic wherein LR and her horse jump off a cliff and survive. (Pl. Opp'n 11; MPI Exh. 58.) The Court notes, however, that jumping off a cliff to escape a foe and miraculously surviving is an unprotectable idea. Plaintiffs have shown no further similarity related to the plot of LR and QOS; therefore, the Court finds that Plaintiffs have not come close to showing the substantial similarity of plot necessary for infringement.[17]

### (4) Mood, Setting, and Pace

Plaintiffs do not attempt to equate the mood and pace of LR and QOS. (Pl. Opp'n 10–11.) They merely point out that QOS and LR are set in the "same mythical, early 19th century, old California setting of the Zorro milieu." (*Id.* at 11.) As the Court has explained, McCulley's setting in "The Curse of Capistrano" is not protected. Furthermore, even if the Court found substantial similarity between LR and QOS in terms of mood or pace, it would be because it considered both works to be action adventures. The similarity, therefore, would not weigh heavily in the Court's decision.[18]

The Court therefore finds under the extrinsic test for substantial similarity that no reasonable jury could find that the series QOS and the comic books at issue are

substantially similar. Stated another way, the Court finds that the comic books at issue and the QOS series are dissimilar as a matter of law. *Kouf,* 16 F.3d at 1045–46. The Court therefore GRANTS Defendant's Motion for Summary Judgment and dismisses Plaintiff's third, fourth, fifth, and sixth claims for copyright infringement of the comic books.

### 2. Unfair Competition

#### a. Lanham Act

■ "The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to the source." *Dr. Seuss Enterprises, L.P. v. Penguin Books U.S.A., Inc.,* 109 F.3d 1394, 1404 & n. 12 (9th Cir.1997) (citation omitted). Plaintiffs' claims for unfair competition are pursuant to section 43(a) of the Lanham Act, California Business and Professions Code section 17200, and common law. " 'Likelihood of confusion' is the basic test for both common law trademark infringement and federal statutory infringement." *Id.* at 1403.[19] Similarly, to state an unfair competition claim under California statutory law, "one need only show that 'members of the public are likely to be deceived.' " *Bank of the West v. Superior Court of Contra Costa County,* 2 Cal.4th 1254, 1267, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992).

---

**17.** The Court notes that Plaintiffs argue, "[b]oth QOS and LR involve young, female Spanish aristocrats who decide to avenge the injury/death of a family member injured by a military assistant to a Spanish military ruler." (Mtn.15.) This "plot summary," however, appears to be merely a reiteration of Plaintiffs' theme.

**18.** Plaintiffs appear to argue that Defendants have infringed the copyrights of Plaintiffs' characters, LR, Scarlett Fever, and Machete, as well as the copyrights in the comic books. To the extent that Plaintiffs are unable to show similarity between the characters in QOS and the characters in LR, however,

Plaintiffs are also unable to show a similarity between QOS and the comic book LR.

**19.** "In determining whether confusion between related goods is likely, the following factors are relevant: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and, (8) likelihood of expansion of the product lines." *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979).

To succeed on their trademark infringement claims, Plaintiffs must establish that they own valid trademark rights. Unless the mark Plaintiffs seek to protect is so arbitrary, unique, and non-descriptive as to constitute a "technical trademark" Plaintiffs must also establish that the mark has secondary meaning.[20] *Frederick Warne & Co., Inc. v. Book Sales, Inc.*, 481 F.Supp. 1191, 1195 (S.D.N.Y.1979). Secondary meaning is defined as "[t]he power of a name or other configuration to symbolize a particular business, product or company." *Id.* (citations omitted). "Consumers need not identify the producer by name," however. *Morgan Creek Prods. Inc. v. Capital Cities/ABC*, 22 U.S.P.Q.2d 1881, 1889 (C.D.Cal.1991.) "Indicia of secondary meaning include advertising expenditures, consumer studies linking the name to a source, sales success, unsolicited media coverage of the product, attempts to plagiarize the mark, and length and exclusivity of the mark's use." *Id.*

To claim ownership of a trademark, however, Plaintiffs must first identify the mark they seek to protect. Plaintiffs concede that there is no infringement of an actual mark; however, they argue that Defendants have infringed their *character* Zorro.[21] Plaintiffs explain in a footnote that they claim trademark status in the following aspects of the character Zorro: the name Zorro; the stylized "Z;" the black costume with sword and whip; Zorro's physical appearance, "both as manifested in about 16 static and dynamic images that have been used to identify authorized 'Zorro' works over the past 40 years, and as those images have coalesced in the public's mind with numerous other similar images to constitute the character 'Zorro' "; and, "a number of associated elements which, combined with one or more of the other elements listed above, identify 'Zorro' to the consuming public." (Pl. Opp'n 12 n. 23.) The Court finds, however, that Plaintiffs have still failed to identify a protectable trademark in the character Zorro.[22]

Plaintiffs have failed to identify a specific image as to which they claim a trademark for the character Zorro. According to Plaintiffs, more than seventeen different aspects of Zorro can each be combined with "a number of associated elements"[23]

---

**20.** Plaintiffs concede that they must establish secondary meaning in this case.

**21.** On their Motion for Preliminary Injunction, Plaintiffs asked the Court, in section (e) of their proposed preliminary injunction, to enjoin and restrain Defendants from:

imitating, copying, or making any other unauthorized use of any common law trademarks and trade dress associated with the distinctive "key art" advertising for the motion picture "The Mask of Zorro;" and/or all common law trademarks and trade dress in the appearance, skills, secret identity motif, personality traits, personal background, setting, signature "Z" mark, or "rearing horse" mark, or any confusingly similar combination of some of those distinctive elements[.]

Because this description is relatively vague, the Court asked Plaintiffs at oral argument to clarify exactly what Plaintiffs claimed as their trademark or trade dress rights in the character Zorro. Plaintiffs attempted to clarify their claim; however, it remained unclear to the Court how Plaintiffs had trademark or trade dress rights in the character Zorro such that Defendants' series QOS could be infringing.

In opposition to Defendants' Motion for Summary Judgment, Plaintiffs have again attempted to define trademark and trade dress rights in Zorro; however, the Court also finds Plaintiff's latest attempt unavailing.

**22.** The Court notes that the parties agree that Defendants did not use the word "Zorro" or the stylized "Z" in the QOS series. It is therefore not important for purposes of this case whether Plaintiffs have a trademark in either the word "Zorro" or the stylized "Z."

**23.** Plaintiffs do not explain what these elements are.

to "identify 'Zorro' to the consuming public." (Pl. Opp'n 12 n. 23.) A "vaguely defined character lacking a *specific* image . . . is unable as a matter of law to 'achieve that fixture or consistency of representation that would seem necessary to constitute a symbol in the public mind.'" *Universal City Studios, Inc. v. Nintendo Co. Ltd.*, 578 F.Supp. 911, 924 (S.D.N.Y.1983) (emphasis added) (quoting *DC Comics, Inc. v. Filmation Assocs.*, 486 F.Supp. 1273, 1277 (S.D.N.Y.1980)). Given that Plaintiffs still cannot point to a specific mark at issue in this case, the Court finds no genuine issue of material fact with respect to Plaintiffs' claim for trademark infringement.

■ Plaintiffs' argument that Defendants have infringed their trade dress rights is similarly weak. In connection with their Motion for Preliminary Injunction, Plaintiffs explained at oral argument that the "key advertising" and other pictures of Zorro connected to the film MOZ form the basis for their trade dress infringement argument. Plaintiffs pointed to MOZ's movie poster advertisement, picturing Zorro in silhouette on a red background, and alleged that Defendants copied elements for the QOS picture on the QOS web site. Plaintiffs also pointed to Defendants' use of a rearing horse pose, which they argued is the mirror image of Plaintiffs' rearing horse pose. Additionally, Plaintiffs mentioned Defendants' use of a silhouetted image of the QOS, back-lit with blue light, which Plaintiffs argued is the way they pictured Zorro in MOZ. It is unclear what additional trade dress, if any, Plaintiffs argue in opposition to Defendants' Motion for Summary Judgment. Plaintiffs' argument in opposition to Defendants' Motion for Summary Judgment

on this claim centers on allegations that Plaintiffs could possess trade dress rights in connection with Zorro or MOZ even though that character and work are not "goods or services" because trade dress includes and protects the "total image" of a product or service. (Pl. Opp'n 16–17.)

Plaintiffs are correct in their recitation of the law inasmuch as the Supreme Court has explained, "[t]he 'trade dress' of a product is essentially its total image and overall appearance." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Plaintiffs still have not, however, defined the "trade dress" in this case. Plaintiffs broadly argue that "the physical appearance of 'Zorro,' together with the distinctive elements with which that character is associated and advertised, are 'trade dress' to the extent they possess secondary meaning . . . ." (Pl. Opp'n 17.) The Court finds Plaintiffs' description to be extremely vague, and therefore finds that Plaintiffs have failed to identify the trade dress they claim to be at issue in this case. *Cf. Sanrio Co. Ltd. v. Ann Arctic Inc.*, 48 U.S.P.Q.2d 1429, 1434 (E.D.N.Y.1998) (finding that, on a motion for preliminary injunction, Sanrio was likely to prove that two- and three-dimensional representations of Sanrio's copyrighted and trademarked products adorned with cartoon characters were protected by trade dress.) The Court therefore finds no genuine issue of material fact with respect to Plaintiffs' claim for trade dress infringement and GRANTS Defendants' Motion for Summary Judgment on Plaintiffs' sixth claim, for violations of section 43(a) of the Lanham Act.[24]

24. Because Plaintiffs have not sufficiently defined their alleged trademark rights to the character Zorro, the Court need not assess whether Plaintiffs have established secondary meaning, let alone whether there is a likelihood of confusion under *Sleekcraft.*

### b. California and Common Law Unfair Competition Claims

Having determined that Plaintiffs' claim for infringement of the copyright in MOZ survives and that Plaintiffs' copyright infringement claims in LR and the Lanham Act claim do not, the Court now turns to Plaintiffs' seventh and eighth claims for relief. Plaintiffs' seventh claim is for common law unfair competition. Their eighth claim is for dilution and statutory unfair competition pursuant to California Business and Professions Code sections 14330 and 17200, *et seq.*

Defendants argue that Plaintiffs' seventh and eighth claims for relief are preempted by the Copyright Act; therefore, they should be dismissed. Plaintiffs argue their seventh and eighth claims survive because the claims seek to vindicate rights that are not equivalent to and contain additional elements not present in copyright law. (Pl. Opp'n 24.)

A claim for "dilution" means that a party may be awarded injunctive relief where there is a "likelihood of injury to business reputation or dilution of the distinctive quality of a mark ...." Cal. Bus. & Prof. Code § 14330. The Court has already dismissed Plaintiffs' trademark infringement claim; therefore, Plaintiffs' claim under California Business and Professions code section 14330 for "dilution of the distinctive quality" of a mark is also DISMISSED.

 "Unfair competition law in California prohibits any 'unlawful, unfair or fraudulent business practice.'" *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir.1998). A state law cause of action is preempted by the Copyright Act if: (1) the rights that a plaintiff asserts under state law are rights equivalent to those rights protected by the Copyright Act, and (2) the work involved falls within the "subject matter" of the Copyright Act. *Id.* (citations omitted). The Court therefore must first examine the nature of Plaintiffs' unfair competition claims to determine what rights they seek to enforce with state law. *Id.*

 Plaintiffs, in their seventh and eighth claims, seek to recover for Defendants' alleged copying of MOZ.[25] The Copyright Act "grants rights 'to reproduce the copyrighted work in copies,' 'to prepare derivative works based on the copyrighted work,' 'to distribute copies ... to the public,' and 'to display the copyrighted work publicly.'" *Id.* (citations omitted). The Court finds that Plaintiffs' state law unfair competition claims are based solely on the rights equivalent to those protected by the federal copyright laws. *Id.* at 1213. In addition, MOZ is copyrighted; thus MOZ clearly falls within the "subject matter" of the Copyright Act.

The Court therefore finds that Plaintiffs' statutory and common law claims for unfair competition are preempted by the Copyright Act. The Court GRANTS summary judgment in favor of Defendants with respect to Plaintiffs' seventh and eighth claims for relief.

### 3. Plaintiffs' Request for a Rule 56(f) Continuance

 In their Opposition to Defendants' Motion for Summary Judgment Plaintiffs make a "motion" under Federal Rule of Civil Procedure 56(f) to have the Court refrain from any grant of summary judgment so that Plaintiffs can, in the remaining discovery period, gather the additional evidence required to survive summary judgment on all of their claims.

---

**25.** Plaintiffs also seek to recover for Defendants' alleged copying of the LR comic books at issue. The Court, however, has already dismissed those claims for lack of similarity under the extrinsic test and does not discuss those claims again here.

Under Rule 56(f), a court may deny a motion for summary judgment when the party opposing the motion cannot present "facts essential to justify the party's opposition." Fed.R.Civ.P. 56(f). The party who seeks the protection of subdivision (f) must state by affidavit[26] the reasons why he or she is unable to present the necessary opposing material. Further, "Rule 56(f) requires the nonmoving party to show that additional discovery would uncover specific facts which would preclude summary judgment." *Maljack Productions, Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 888 (9th Cir.1996). The moving party must set forth specific needed facts, and must also specify "how [those facts] would preclude summary judgment." *Garrett v. City & County of San Francisco*, 818 F.2d 1515, 1518 (9th Cir.1987).

The Court DENIES Plaintiffs' Rule 56(f) Motion on the grounds that Plaintiffs have not identified discovery that would allow them to show similarity between the QOS series and the LR comic books or that would allow them to clearly articulate a claim for trademark infringement, dilution, or unfair competition.

### B. Plaintiffs' Motion to Dismiss, for Summary Judgment, and to Strike

■■■ Plaintiffs have moved to dismiss Defendants' first and third counter-claims, for summary judgment on Defendants' second through fifth counter-claims, and for summary judgment on or to strike Defendants' second through fifth affirmative defenses. Defendants oppose Plaintiffs' Motion and request that, if the Court finds Defendants' counter-claims deficient, the Court grant Defendants leave to amend. The Court has reviewed the case file, and finds Plaintiffs have not filed a responsive pleading to Defendants' Counter–Claim. Defendants, therefore, may still amend their Counter–Claim once as a matter of right. Fed.R.Civ.P. 15(a); *Crum v. Circus Circus Ent.*, 231 F.3d 1129, 1130 n. 3 (9th Cir.2000); *Kirk v. United States*, 232 F.2d 763, 770 (9th Cir. 1956); *see also* William W Schwarzer, et al., *Civil Procedure Before Trial* § 8:382 (counter-claims may be amended as a matter of right any time before an answer is served).[27]

### 1. Defendants' First Counter–Claim

Defendants' first counter-claim is for invalidity of trademarks and service marks.

**26.** The formality of an affidavit and a formal Rule 56(f) "motion" has not always been required. *See, e.g., Garrett v. City & County of San Francisco*, 818 F.2d 1515, 1518 (9th Cir. 1987) (considering an outstanding discovery motion enough to raise the issue). However, a district court may in its discretion deny a Rule 56(f) motion simply because the party opposing the motion for summary judgment has not complied with procedural formalities. *See Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir.1986) ("Failure to comply with the requirements of Rule 56(f) is a proper ground for denying discovery and proceeding to summary judgment.").

**27.** The Court notes that Defendants do not appear to have requested leave to amend their Answer in connection with their affirmative

defenses. Pursuant to Federal Rule of Civil Procedure 15(a), Defendants could have amended their answer as a matter of course only within twenty days after their original answer was served. Defendants' Answer was served in March; therefore, the time to amend as a matter of course is long passed. Defendants may, however, amend their Answer with the consent of the adverse party in this action. Fed.R.Civ.P. 15(a). In the alternative, Defendants may seek leave of the Court to amend their Answer. *Id.* The Court reminds the parties that federal policy strongly favors determination of cases on their merits and that denial of leave to amend is permitted in only limited circumstances. The Court therefore strongly encourages the parties to consider stipulating to amendment should the issue arise.

Specifically, Defendants allege that Plaintiffs' *registered* trademarks and service marks in connection with the Zorro character are invalid as against the QOS series. (Counter–Claim ¶¶ 50–53.) Plaintiffs argue that this counter-claim should be dismissed for failure to state a claim upon which relief can be granted because Defendants have failed to allege a basis for invalidating Plaintiffs' federally registered trademarks. Plaintiffs also point out that, even assuming that Zorro were not protectable by trademark, "that would not prevent issuance of the registrations at issue, or affect the validity of those trademark registrations, or prevent Plaintiffs from enforcing the trademark rights they possess based on those registrations." (Pl. Reply 3.)

The Court finds that Defendants have failed to sufficiently state a claim for relief in connection with their first counter-claim. Defendants do not allege facts to support their claim that Plaintiffs' *registered* trademarks and service marks are invalid. Instead, Defendants practically defeat their own claim in admitting that "Zorro Productions may have some trademark and/or copyright protection in and to particular registered descriptions or expressions of 'Zorro,'...." (Counter–Claim ¶ 48(G).) The Court therefore finds that Defendants' first counter-claim fails to state a claim upon which relief can be granted and DISMISSES IT WITH LEAVE TO AMEND.

## 2. Defendants' Second Counter–Claim

Defendants' second counter-claim is for invalidity of copyrights. Defendants state that ZPI has alleged that it has registered a number of copyrights in connection with the Zorro and LR characters. Defendants allege that "[w]hile these copyrights might validly protect the particular registered works from copying, they do not afford any copyright in the 'Zorro' character or 'Lady Rawhide' character, are all invalid as against counter-claimants' [QOS] series, and do not afford the purported rights which counter-defendants claim in their complaint." (Counter–Claim ¶ 56.) Defendants therefore request that "counter-defendants' copyrights be declared invalid as against [the QOS] series and for all other purposes." (*Id.* at ¶ 57.) Plaintiffs argue for summary judgment on this counter-claim because any lack of copyright in the character Zorro does not invalidate Plaintiffs' copyright registrations in recent works that include the character Zorro. Defendants, instead of responding to Plaintiffs' argument, attempt to convince the Court that their second counter-claim is proper because it is really for "misuse of copyright." (Def. Opp'n 14–15.)

The Court finds that Defendants have, again, failed to state facts sufficient to constitute a claim. Defendants do not allege facts to support their allegations that Plaintiffs' registered copyrights are invalid. Instead, Defendants again practically defeat their own claim by admitting that Plaintiffs' copyrights are valid. (Counter–Claim ¶ 56, stating that "[Plaintiffs'] copyrights might validly protect the particular registered works from copying ....") Moreover, the Court does not find that Defendants, who fail to specifically mention misuse, have alleged a "misuse of copyright" claim in their second counter-claim.[28] The Court therefore DISMISSES

---

**28.** The Court expresses no opinion at this time as to the validity of Defendants' "misuse of copyright" theory raised in opposition to Plaintiffs' Motion. Defendants raise this argument in connection with their second and third counter-claims, even though neither counter-claim specifically mentions "misuse." Instead, both of these counter-claims, as well as all of Defendants' other counter-claims, incorporate by reference the allegation that "Zorro Productions is seeking to use copy-

WITH LEAVE TO AMEND Defendants second counter-claim.

### 3. Defendants' Third Counter–Claim

In their third counter-claim, for declaratory relief, Defendants allege that "[a]n actual controversy has arisen, and now exists, between counter-claimants and counter-defendants regarding the scope and validity of counter-defendants' claimed copyrights and trademarks, and their enforceability as against counter-claimants' [QOS] series." (Counter–Claim ¶ 59.) Defendants ask the Court for a "declaration of rights and responsibilities ... to determine the parties' respective rights and responsibilities in connection with these matters and the 'Zorro' character." (*Id.*)

The Court declines at this time to dismiss, or to grant Plaintiffs' Motion for Summary Judgment as to, Defendants' third counter-claim. The Court has already dismissed Plaintiffs' trademark claim; therefore, Defendants' counter-claim has a basis inasmuch as Defendants seek a declaration of rights and responsibilities in connection with Plaintiffs' defective claim for trademark in the character Zorro. This counter-claim is also appropriate in light of Plaintiffs' surviving claim for copyright infringement in MOZ.

### 4. Defendants' Fourth Counter–Claim

Defendants' fourth counter-claim is for violation of California Business and Professions Code sections 14330 (dilution) and

17200 (statutory unfair competition). Plaintiffs request summary judgment in their favor for various reasons on both claims. Defendants do not address in their Opposition how their section 14330 dilution claim survives Plaintiffs' Motion for summary judgment. The Court therefore DISMISSES WITHOUT LEAVE TO AMEND Defendants' counter-claim with respect to the section 14330 dilution allegation.

 Defendants oppose summary judgment on their section 17200 allegation; however, the Court has determined on its own inquiry that Defendants' fourth counter-claim must be dismissed for lack of standing.[29] Standing is a threshold requirement in every federal case. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). "As an aspect of justiciability, the standing question is whether the plaintiff has alleged such a personal stake in the controversy as to warrant [plaintiff's] invocation of federal court jurisdiction." *MAI Sys. Corp. v. UIPS,* 856 F.Supp. 538, 540 (N.D.Cal.1994) (citation omitted). The "three separate but interrelated components" of Article III standing are: (1) a distinct and palpable injury to the plaintiff ("injury"); (2) a fairly traceable causal connection between the injury and challenged conduct ("causation"); and (3) a substantial likelihood that the relief requested will prevent or redress the injury ("redressability"). *Id.* (citing *McMichael v. County of Napa,* 709 F.2d 1268, 1269 (9th Cir.1983)). There are also three prudential limitations on standing: (1) the

---

right, trademark, and unfair competition law in an inappropriate fashion in an attempt to obtain an unlawful monopoly not only in the character 'Zorro,' but also other masked crusader characters and works." (Counter–Claim ¶ 48(E).) The Court notes, however, that to the extent that this allegation states a "misuse of copyright" theory, that theory must be pled as an affirmative defense, not as a counter-claim. *Practice Management Infor-*

*mation Corp. v. American Medical Ass'n,* 121 F.3d 516, 520 (9th Cir.1997).

**29.** The parties do not address the issue of standing in their briefs. Even though the parties have failed to raise this issue, the Court must address it. *United States v. Hays,* 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995).

plaintiff must assert his own rights and "cannot rest his claim to relief on the legal rights or interests of third parties;" (2) the plaintiff may not assert a generalized grievance; and (3) plaintiff's interest must be "arguably within the zone of interests to be protected." *McMichael,* 709 F.2d at 1270.

■ Because standing is a jurisdictional inquiry, states "have no power directly to enlarge or contract federal jurisdiction." *Fiedler v. Clark,* 714 F.2d 77, 79–80 (9th Cir.1983) (finding no standing to sue in federal court as a private attorney general where the state statute purported to confer standing to enforce federal statutes which themselves did not provide a private right of action); *see MAI,* 856 F.Supp. at 540–41. As such, a party seeking relief in federal court pursuant to California's unfair competition statute must satisfy Article III standing requirements, even though California's unfair competition statute may be enforced in state court by a variety of public entities and by "any person acting for the interests of itself, its members or the general public." Cal. Bus. & Prof. Code § 17204; *see MAI,* 856 F.Supp. at 541.

■ The Court finds that Defendants have neither alleged in their Counter–Claim nor explained in their papers how they have suffered a distinct and palpable injury as a result of Plaintiffs' allegedly unfair business practices.[30] Instead, it appears that Defendants allege that *other* entities have been injured by Plaintiffs'

allegedly unfair business practices. For example, Defendants argue their section 17200 claim is proper because while they were previously "unaware of the level of deception Plaintiffs were employing to extort money out of numerous entities over a course of years," they can now allege "a pattern of extortion." (Def. Opp'n 14.) The Court finds that Defendants have not shown that they have their own distinct injury; therefore, the Court cannot find that Defendants have standing to bring a section 17200 claim in federal court. The Court therefore DISMISSES WITHOUT LEAVE TO AMEND Defendants' section 17200 counter-claim.[31]

### 5. Defendants' Fifth Counter–Claim

■ Defendants' fifth counter-claim is for common law unfair competition. Plaintiffs request summary judgment because Defendants have failed to state a claim for common law unfair competition. Defendants do not oppose Plaintiffs' Motion for Summary Judgment on this counter-claim. In addition, case law is clear that the common law tort is limited to passing-off. *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1147 (9th Cir.1997). The Court DISMISSES WITHOUT LEAVE TO AMEND Defendants' fifth counter-claim.

### 6. Defendants' Second Through Fifth Affirmative Defenses

Finally, Plaintiffs ask the Court to strike or grant summary judgment in their fa-

---

**30.** Defendants' unsupported comment to the effect that Plaintiffs have attempted to extort license fees from Defendants through "manifold registrations" is insufficient to allege injury. (Def. Opp'n 18.)

**31.** Even assuming Defendants were able to allege a cognizable Article III injury, it is unclear what effective redress, if any, the Court could offer Defendants under section 17203. Any claim for monetary relief is

barred by the rule limiting recovery under section 17203 to restitution and injunctive relief. Cal. Bus. & Prof.Code § 17203; *see MAI,* 856 F.Supp. at 542. Defendants' prayer for relief on this counter-claim includes a prayer for damages, which is barred. Defendants also request restitution in connection with this counter-claim; however, it is unclear on what theory Defendants could seek restitution from Plaintiffs. *MAI,* 856 F.Supp. at 542.

vor [32] on Defendants second through fifth affirmative defenses. Defendants assert a total of fifteen affirmative defenses. The four affirmative defenses Plaintiffs seek to strike are: (2) "[t]he copyrights alleged in the complaint are invalid and unenforceable, both generally and specifically as to defendants' QOS;" (3) "[t]he trademarks and service marks alleged in the complaint are invalid and unenforceable, both generally and specifically as to defendants' [QOS];" (4) "[t]he 'Zorro' character is not owned by plaintiffs, or any of them;" and (5) "[t]he Zorro character is in the public domain." (Answer ¶¶ 2, 3, 4, 5.) [33] Plaintiffs argue that these affirmative defenses should be stricken because they do not affect whether the character Zorro is entitled to trademark protection and they do not affect the status of Plaintiffs' copyright registrations in recent works that include Zorro. (Pl.Mtn.2, 8.) Defendants argue these defenses should not be stricken because they "provide Plaintiffs with fair notice of the claim being asserted and the 'grounds upon which it rests.'" (Def. Opp'n 13, 15.)

Rule 12(f) allows a party to move to strike any "insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed.R.Civ.P. 12(f). Motions to strike are generally "disfavored" because they are "often used as delaying tactics and because of the limited importance of pleadings in federal practice." *Bureerong v. Uvawas,* 922 F.Supp. 1450, 1478 (C.D.Cal.1996) (citation omitted).

The Court has already granted Defendants' Motion for Summary Judgment on all of Plaintiffs' claims except for Plaintiffs' claim for copyright infringement in MOZ. The only challenged affirmative defense, therefore, that may still be material to the case is the second one, wherein Defendants allege that "[t]he copyrights alleged in the complaint are invalid and unenforceable, both generally and specifically as to defendants' QOS." (Answer ¶ 2.) The Court finds that the other three affirmative defenses, which Defendants claim relate to Plaintiffs' trademark claim, are immaterial in light of the Court's dismissal of that claim. (Def. Opp'n. 13 (explaining that Defendants' third, fourth, and fifth affirmative defenses were intended to "raise Plaintiffs' inability to show that they own a trademark in the character Zorro in the first place.")) In addition, the Court finds that the third, fourth, and fifth affirmative defenses have no bearing on Plaintiffs' remaining claim for copyright infringement in MOZ.[34] *See Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 481 (9th Cir.2000) (discussing elements of copyright infringement). Therefore, the Court STRIKES Defendants' third, fourth, and fifth affirmative defenses as immaterial.

## IV. CONCLUSION

For the reasons explained herein, the Court hereby GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment. The Court GRANTS Defendants' Motion for Summary Judgment with respect to all of Plaintiffs' claims *except* for Plaintiffs' first claim, for copyright infringement of MOZ.

---

**32.** The Court declines at this early stage in the litigation to consider dismissing Defendants' affirmative defenses on summary judgment grounds.

**33.** Notably, Defendants' ninth affirmative defense, which Plaintiffs do not seek to strike, asserts that "[t]he public does not associate the 'Zorro' character with plaintiffs, and thus there can be no confusion in the public." (Answer ¶ 9.) The Court notes that this affirmative defense also appears to relate to Plaintiffs' trademark claim.

**34.** The Court notes that the issue whether ZPI owns a copyright in the character Zorro is not currently before the Court.

The Court DENIES Plaintiffs' Rule 56(f) Motion.

The Court also GRANTS IN PART and DENIES IN PART Plaintiffs' Motion. The Court DENIES Plaintiffs' Motion with respect to Defendants' third counter-claim. The Court GRANTS Plaintiffs' Motion and DISMISSES WITHOUT LEAVE TO AMEND Defendants' fourth and fifth counter-claims. The Court DISMISSES WITH LEAVE TO AMEND Defendants' first and second counter-claims. Finally, the Court STRIKES Defendants' third, fourth, and fifth affirmative defenses.

**SO ORDERED.**